UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

AHW INVESTMENT PARTNERSHIP, MFS, INC.,       10 Civ. 9646 (DLC)
ANGELA H. WILLIAMS, As Trustee of the ANGELA H.
WILLIAMS GRANTOR RETAINED ANNUITY TRUST       **AMENDED COMPLAINT**
UAD MARCH 24, 2006, the ANGELA WILLIAMS
GRANTOR RETAINED ANNUITY TRUST UAD April       **JURY TRIAL DEMANDED**
17, 2006, the ANGELA WILLIAMS GRANTOR
RETAINED ANNUITY TRUST UAD MAY 9, 2006, the
ANGELA WILLIAMS GRANTOR RETAINED
ANNUITY TRUST UAD NOVEMBER 1, 2007, the
ANGELA WILLIAMS GRANTOR RETAINED
ANNUITY TRUST UAD MAY 1, 2008, the ANGELA
WILLIAMS GRANTOR RETAINED ANNUITY TRUST
UAD JULY 1, 2008,  and the ANGELA WILLIAMS
GRANTOR RETAINED ANNUITY TRUST UAD
NOVEMBER 21, 2008,

                       Plaintiffs,

             *-against-*

CITIGROUP INC., CHARLES PRINCE, VIKRAM
PANDIT, ROBERT RUBIN, ROBERT DRUSKIN,
THOMAS G. MAHERAS, MICHAEL STUART KLEIN,
DAVID C. BUSHNELL and GARY CRITTENDEN,

                       Defendants.

------------------------------------------------------------------------ X

JACOB H. ZAMANSKY
EDWARD H. GLENN, JR.
KEVIN D. GALBRAITH
ZAMANSKY & ASSOCIATES LLC
50 Broadway, 32nd Floor
New York, New York 10004
Telephone:  (212) 742-1414
Facsimile:   (212) 742-1177

*Counsel for Plaintiffs*

Plaintiffs, by and through their attorneys, for their Amended Complaint against Defendants, allege as follows upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters.

## I.      SUMMARY OF THE CASE

1.      This is a diversity action for common law negligent misrepresentation and fraud related to the Plaintiffs' investments in Citigroup Inc. common stock. Plaintiffs—entities formed, beneficially owned and/or controlled by Arthur L. Williams ("Williams") and his wife Angela H. Williams ("Angela"), both citizens of the state of Florida (together, the "Plaintiffs" or the "Williamses" or the "Williams Entities")—lost approximately $809,950,000 as a direct result of Defendants' material misrepresentations and omissions related to the true financial condition of Defendant Citigroup Inc. ("Citi" or "Citigroup" or the "Company").

2.      In 1977, Williams founded his own financial services company specializing in insurance.  By 1989, his company—now called Primerica Corporation—merged with the Travelers Group, which in turn merged with Citibank in 1998 to become Citigroup.

3.      In 1998, Williams acquired 17.6 million shares of Citigroup common stock valued at approximately $35 per share in exchange for his shares in the successor company to the one he founded.  By the beginning of 2007, these shares were held by Williams and his wife in a partnership, a corporation and other entities for tax, estate and investment-planning purposes.

4.      To help manage these investments and entities, Williams also formed a "family office" near Atlanta, Georgia, comprised of several professionals who worked

solely for him ("Family Advisors").  He also hired a group of highly experienced financial advisors at top-tier financial services and investment firms ("Financial Advisors"), including an individual who was the Chief Investment Officer at a prominent Swiss bank.  His Family Advisors assisted Williams in carefully tracking and monitoring the performance and prospects of his investments, with a particular focus on his Citigroup stock, and gathering data and investment analysis from his Financial Advisors.

5.     In May of 2007, in consultation with his Advisors, Williams planned to sell out his entire Citigroup position and did in fact sell approximately one million shares.

6.     At that point Williams and his Advisors undertook an exhaustive assessment of Citigroup's financial condition.  Sifting through the Company's public statements and filings, and through his Advisors' direct communications with various Citigroup executives as outlined below, Williams was misled into believing that the Company was in solid shape.  Plaintiffs' detailed survey of Citigroup's public and private representations erroneously led them to believe the bank was largely insulated from the subprime mortgage mess that would eventually engulf the financial services sector.  In justified and reasonable reliance upon Citigroup's misrepresentations and omissions, Williams reversed course and decided against selling out the rest of his position.

7.     As Citigroup slowly started to reveal the truth about its financial condition in piecemeal fashion beginning in November 2007, it eventually became clear that Williams had made a terrible mistake by trusting the word of Citigroup.  In

November 2007, the Company admitted for the first time that it had massive exposure to "toxic" subprime collateralized debt obligation ("CDO")assets. This multi-billion-dollar exposure, along with other undisclosed credit market risk, ultimately caused the firm's stock to drop from nearly $60 to just $2 per share.

8.     Between Williams' initial decision to sell—then the decision to reverse course and hold—in May 2007 and the time he finally liquidated his position in March 2009, Williams and his team constantly monitored Citigroup's prospects for recovery. At several points during that period, as the share price drifted downward, Williams strongly considered selling in order to minimize his losses.

9.     Ultimately, once the federal government bailout and the detailed filings that followed the bailout revealed the true magnitude of Citigroup's subprime exposure, Williams came to understand that the Company's share price would never recover. At that point, in March 2009, he liquidated the remainder of his position at a share price of $3.09.

10.     The nature and contours of Citigroup's credit market misrepresentations have now been laid out in detail by the Securities and Exchange Commission's ("SEC") Complaint and the Financial Crisis Inquiry Commission's published report. In addition, the central allegations concerning the fraud have been sustained in the shareholders and bondholders' class actions pending before the Honorable Judge Sidney Stein in this District.

11.     It was these same false statements that directly induced Williams' to hold the vast majority of his shares until they had plummeted over ninety percent. As a

result of their negligence and/or fraud, Defendants are responsible for Plaintiffs' damages and should be held accountable.

12.     Count I below asserts a common law negligent misrepresentation claim against the Defendants under Florida law.  Any claim of fraud is specifically disclaimed for purposes of this count.  Count II below asserts a common law claim for fraud under Florida law, which incorporates by reference most of the allegations in Count I, but also alleges additional facts which establish that Citigroup and the other Defendants knowingly or recklessly mislead the Plaintiffs.

## II.     JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction over this action, pursuant to 28 U.S.C. § 1332, because there is complete diversity between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Plaintiff AHW Investment is a Nevada Partnership whose partners, Angela H. Williams and Arthur L. Williams, are both citizens of the state of Florida.

15.     Plaintiff MFS, Inc. is a Nevada Corporation controlled by its majority shareholder, Arthur L. Williams, a citizen of the state of Florida.

16.     Plaintiff Angela Williams, as trustee of the Angela H. Williams Grantor Retained Annuity Trust UAD March 24, 2006, The Angela Williams Grantor Retained Annuity Trust UAD April 17, 2006, The Angela Williams Grantor Retained Annuity Trust UAD May 9, 2006, The Angela Williams Grantor Retained Annuity Trust UAD November 1, 2007, The Angela Williams Grantor Retained Annuity Trust UAD May 1, 2008, The Angela Williams Grantor Retained Annuity Trust UAD July 1, 2008,  and the

Angela Williams Grantor Retained Annuity Trust UAD November 21, 2008, is a citizen of the state of Florida and manages all trusts from the state of Florida.

17.     Defendant Citigroup is incorporated under the laws of Delaware and is headquartered in New York, and is thus a citizen of both Delaware and New York.

18.     Defendant Vikram Pandit is a citizen of New York.

19.     Defendant Charles Prince is a citizen of Connecticut.

20.     Defendant Robert Rubin is a citizen of New York.

21.     Defendant Robert Druskin is a citizen of New Jersey.

22.     Defendant Thomas G. Maheras is a citizen of New York.

23.     Defendant Michael Stuart Klein is a citizen of New York.

24.     Defendant David C. Bushnell is a citizen of New Jersey.

25.     Defendant Gary Crittenden is a citizen of Utah.

26.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391 because, as set forth below, Defendant Citigroup maintains its corporate headquarters in this District, and all Defendants conduct business in, and may be found in, this District.

### III.     THE PARTIES

27.     Plaintiff AHW Investment Partnership ("AHW") is a partnership organized under the laws of Nevada with a principal place of business in Nevada. AHW's sole partners are Arthur L. Williams and his wife, Angela Williams, both citizens of the state of Florida. AHW was established for investment planning purposes. During the relevant time period, AHW owned and held shares of Citigroup common stock which are the subject of this claim.

28.     Plaintiff MFS Inc. ("MFS") is a corporation incorporated under the laws of Nevada, with a principal place of business in Nevada.  Williams, a citizen of the state of Florida, is MFS's President and majority shareholder. MFS was established for investment purposes.  During the relevant time period, MFS owned and held shares of Citigroup common stock which are the subject of this claim.

29.     Plaintiff Angela H. Williams is a citizen of Florida and the Trustee of seven (7) GRATs in the names, and established on the dates, which are identified in the caption. Angela (and Williams) established the GRATs for tax, estate and investment-planning purposes.   During the relevant time period, she owned and held through GRATs shares of Citigroup common stock which are the subject of this claim.

30.     Defendant Citigroup Inc. is and has been a diversified global financial services holding company, incorporated under the laws of Delaware, and headquartered at 399 Park Avenue, New York, New York.  Citigroup offers a broad range of financial services to consumer and corporate customers, with more than 200 million customer accounts and operations in more than 100 countries.  Citigroup is a public company and its common stock trades on the New York Stock Exchange Inc. under the symbol "C."

31.     Defendant Charles "Chuck" Prince ("Prince") served as Citigroup's Chief Executive Officer from October 2003 to November 4, 2007, when he resigned in the wake of revelations of large losses stemming from Citigroup's CDO exposure.  He also served as the Company's Chairman from April 18, 2006 through November 14, 2007.  Prince signed Citigroup's Form 10-K and Form 10-Q annual and quarterly report filings through the third quarter of 2007, and certifications under Sections 302 and 906 under the Sarbanes-Oxley Act. Prince also participated in conference calls with analysts

and investors (including Williams' Advisors), and was quoted in the press about the Company. As the most senior executive officer during his tenure, Prince was responsible for the day-to-day operations of the Company and the untrue representations and statements and material omissions on which Plaintiffs relied.

32.     Defendant Vikram Pandit ("Pandit") has served as Citigroup's Chief Executive Officer and a director from December 11, 2007 through the present.  Pandit signed Citigroup's Form 10-K and Form 10-Q annual and quarterly report filings for the first three quarters of 2008 and the certifications under Sections 302 and 906 under the Sarbanes-Oxley Act.  Pandit also participated in conference calls with analysts and investors (including Williams' Advisors), sent out investor slideshows under his name and was quoted in the press about the Company. As the most senior executive officer during his tenure, Pandit was responsible for the day-to-day operations of the Company, and the untrue representations and statements and material omissions on which Plaintiffs relied.

33.     Defendant Robert Druskin ("Druskin") was the President of Citi Markets and Banking until December 2006, and the CEO of that business segment until May 2007. From December 2006 until his retirement in December 2007, Defendant Druskin was Citigroup's Chief Operating Officer ("COO") and a member of the Office of the Chairman. As a member of the Office of Chairman, the heads of all Citigroup's businesses reported to Defendant Druskin. As COO, Defendant Druskin supervised all of Citigroup's businesses. Defendant Druskin was also a member of Citigroup's Business Heads, Operating and Management Committees. Accordingly, Defendant Ruskin had direct involvement in the daily affairs of Citigroup during the Relevant Period.

34.     Defendant Thomas G. Maheras ("Maheras") was the co-President of Citi Markets & Banking from January 2007 and co-Chairman and co-CEO of Citi Markets & Banking from May 2007 until his resignation in October 2007. From 2004 through his resignation, Defendant Maheras was also the CEO of Global Capital Markets, a division of Citi Markets & Banking. Citi Markets & Banking is the business segment that arranged the CDOs and other risky subprime off-ba1ance-sheet entities. Notably, the $55 billion in sub-prime direct exposure that led to Citigroup's massive $8 to $11 billion write-down was in Maheras' business segment. Because of his high-level positions, Defendant Maheras was directly involved in the everyday business of Citigroup. During the Relevant Period, Defendant Maheras participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders such as Williams.

35.     Defendant Michael Stuart Klein ("Klein") was the co-President of Citi Markets & Banking since January 2007 and co-Chairman and co-CEO of Citi Markets & Banking since May 2007. From 2004, Defendant Klein was the CEO of Global Banking, a division of Citi Markets & Banking. Notably, the $55 billion in subprime direct exposure that led to Citigroup's massive $8 to $11 billion write-down was in Klein's business segment. Defendant Klein is also a member of Citigroup's Business Heads, Operating and Management Committees. Because of his high-level positions, Defendant Klein was directly involved in the daily affairs of Citigroup. During the Relevant Period, Defendant Klein participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders such as Williams.

36.     Defendant David C. Bushnell ("Bushnell") was Citigroup's Senior Risk Officer from December 2003, and Citigroup's Chief Administrative Officer ("CAO") from September 2007 until his retirement in December 2007. Defendant Bushnell was also a member of Citigroup's Business Heads, Operating and Management Committees. As Citigroup's Senior Risk Officer, Defendant Bushnell was responsible for managing market, credit and operational risk and for regulatory compliance at the Company. As Citigroup's CAO, Defendant Bushnell was responsible for the Human Resources, Legal, Security and Investigative Services, and Compliance functions for the entire Company. Accordingly, Defendant Bushnell had direct involvement in the daily affairs of Citigroup during the Relevant Period. During the Relevant Period, Defendant Bushnell participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

37.     Defendant Robert Rubin ("Rubin") was a Director of Citigroup and Chairman of the Executive Committee since 1999. Following Defendant Prince's departure, Rubin was named Chairman of the Board of Directors.  As Chairman of the Board of Directors, Rubin was responsible for the day-to-day operations of the Company and the untrue representations and statements and material omissions on which Plaintiffs relied.

38.     Defendant Gary Crittenden ("Crittenden") served as Citigroup's Chief Financial Officer from March 12, 2007 until March 2009. He then served as Chairman of Citi Holdings until July 9, 2009, when he left to join a private equity firm. Crittenden signed Form 10-K and Form 10-Q annual and quarterly report filings for

2007 and 2008 and the certifications under Sections 302 and 906 under the Sarbanes-Oxley Act. Crittenden also participated in conference calls with analysts and investors (including Williams' Advisors), and was quoted in the press about the Company.  As one of the most senior executive officers during his tenure, Crittenden was responsible for the day-to-day operations of the Company, and the untrue representations and statements and material omissions on which Plaintiffs relied.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.  The Defendants' Misrepresentations and Omissions

39.    From 2006 through early 2009, Citigroup's public disclosures consisted of a series of misstatements and omissions regarding, at heart, the Company's exposure to the mushrooming subprime crisis and the subsequent impact on its solvency.  For months, when the topic was at the top of every observer's agenda, Citigroup led investors to believe that it had only marginal and immaterial subprime mortgage exposure.   Then, belatedly, the Company reported that, while it did have some exposure, it claimed it was relatively small and, in any case, would easily be covered by loss reserves already set aside.

40.    The nature of Citigroup's previously undisclosed credit market exposures is now a matter of public record, having resulted in a July 2010 $75-million settlement between the Company and the SEC. The SEC charged Citigroup with making "a series of material misstatements about its investment bank's exposure to sub-prime mortgages…at a time of heightened investor and analyst interest in public company exposure to sub-prime mortgages."  The SEC Complaint lays out in stark detail the extent of the misrepresentations, including the very same public filings,

conference calls and public statements that Williams and his Advisors received, reviewed and relied on to such a great degree.  *See generally Securities and Exchange Commission v. Citigroup Inc.*, 10-cv-01277 (ESH) (D.D.C.)

41.     Also during July 2010, United States District Judge Sidney H. Stein denied the bulk of Citigroup's motion to dismiss a bondholders' securities class action centered on these same defective disclosures upon which Plaintiffs here relied, *In re Citigroup Bond Litigation*, 08 Civ. 9522 (SHS) (S.D.N.Y.).  Further, on November 9, 2010, Judge Stein issued an opinion in the shareholders' securities litigation, *In re Citigroup Inc. Securities Litigation*, 09 md 2070 (SHS) (S.D.N.Y.), allowing the plaintiffs' core fraud claims to proceed to discovery.  In both of these actions, plaintiffs filed lengthy and detailed complaints replete with facts concerning the contours of Citigroup's fraud.  Judge Stein issued two thorough and thoughtful analyses of Citigroup's false statements and omissions, upholding the plaintiffs' central claims in both actions.  As the same principal allegations concerning Citigroup's false statements in the two class actions are squarely on point with those at issue here, Judge Stein's reasoning and conclusions are likewise applicable to the allegations herein.

42.     The Financial Crisis Inquiry Commission ("FCIC"), a select bipartisan government body that has conducted the most exhaustive examination of Citigroup to date, uncovered he fact that the Office of the Comptroller of the Currency ("OCC") and the Federal Reserve Bank had jointly observed in November 2007 several facts regarding Citigroup that turned out to be pertinent to its subprime mess: that the bank's "risk appetite [had] increased in pursuit of earnings late in the credit cycle"; that Citigroup's CDO business had been increasing; that the bank had "doubled its

leveraged lending limit and CDO limit in late 2006"; that it lowered its underwriting standards in order to "maintain deal volume"; and that it "did not mitigate the risk" of its liquidity puts.

43.     Defendants had a duty, as a result of a special relationship, *i.e.*, the issuer of shares to public investors, to give correct and accurate information regarding its balance sheet and overall financial condition.  Put another way, Citigroup, as a public company with unique expertise regarding its own financial condition and exposure to subprime assets, represented by its most senior officers making public statements that it knew were subject to multilayered legal and regulatory requirements, owed Plaintiffs a duty of candor.

44.     Defendant Citigroup owed a duty to Williams, as a result of its direct relationship it established with him during his years as a substantial shareholder vis-à-vis the specific information that it provided to Williams and his Advisors through its senior executives.

45.     Defendants made multiple false representations that they should have known were incorrect.  Defendants knew that Plaintiffs desired the information supplied in the representations for a serious purpose, *i.e.*, to decide whether to hold or sell their shares in Citigroup.

46.     Plaintiffs intended to rely, and did in fact rely and act upon the information provided by Defendants; indeed, that was their entire purpose in so carefully tracking Citigroup's financial condition.  Plaintiffs reasonably relied on Defendants' representations to their detriment, namely, they decided to hold rather than sell their large stake in Citigroup while it fell to $3.09 per share.

47.     This is perhaps the unusual case in which Plaintiffs can demonstrate specific actual reliance on Defendants' fraudulent statements, as there is a years-long paper trail documenting that reliance. And further, again supported by specific writings, Plaintiffs are in the rare position of being able to demonstrate how much of the stock they would have sold and when, had they been given the opportunity to read a truthful account of Citigroup's financial condition.

48.     Had Williams received truthful and honest disclosures from Citigroup about the true state of its financial health, its subprime mortgage exposure and its related risks, he would have sold all of his shares in May 2007 at $55 per share and diversified into safer investments. At the time, he had previously taken steps to implement his plan to sell his stock by examining the consequences of sales, creating GRATs and transferring share of his stock into GRATs.  He also sold one million shares independently from the GRATs.

49.     He also considered selling out his remaining 16.6 million shares on three other separate occasions—at $33 per share, $17.50 per share and $8.50 per share—in an effort to minimize his losses.  He delayed doing so in continued reliance on the Company's misrepresentations and omissions.

50.     And as a result of this reliance, Plaintiffs suffered approximately $809,950,000 in compensatory damages.

**B.     Citigroup's False and Misleading Statements and Omissions**

51.     During the relevant time period from 2006 through 2009, Citigroup engaged in a massive fraud and deceived shareholders over its financial condition, solvency and risk from illiquid or impaired assets. Through public statements and financial reports, Citigroup presented balance sheets, assets, revenues, returns on capital

and capital ratios that were false and misleading, and deceived shareholders regarding its true financial condition and insolvent state. Citigroup concealed the full extent and impairment of billions in "toxic" assets, including CDOs backed by subprime assets, and the risks associated with them.  Citigroup also gave investors the impression that it was reducing and prudently managing its risks, which was simply not true.

52.     As described earlier in this Complaint, Williams, through his Financial Advisors, tracked a wide range of public information concerning Citigroup.  The information they specifically relied upon included all of the misleading public statements and financial reports described in detail herein.

53.     Citigroup's false statements misrepresentation can be categorized as relating to the overarching categories itemized as follows, among which there is significant interplay.

54.     First, Defendants failed to disclose Citigroup's exposure to more than $66 billion worth of CDOs backed by subprime mortgage assets. From late 2006 through November 2007, Citigroup's public filings and statements indicated that Citigroup had no direct exposure to subprime mortgage-backed CDOs, precisely when subprime mortgage crisis quickly escalated and every financial institution's exposure to subprime-backed assets was at the top of every investor's list of need-to-know data.  Citigroup then made a materially incomplete and partial disclosure which misled investors. After November 2007 through to January 2009, Citigroup failed to truthfully and accurately disclose its impairments until the full details were released on the assets that the government was forced to guarantee to prevent the Company's collapse.

55.     Williams and his Advisors relied on the Company's false and misleading disclosures regarding subprime mortgage CDOs.

56.     Second, Defendants failed to properly disclose Citigroup's exposure to $100 billion in structured investment vehicles ("SIVs") backed primarily by subprime mortgage assets, despite the fact that Citigroup's deployment of the SIVs was a means to keep the subprime assets off its balance sheet.  While Citigroup maintained in its public statements that it had only "limited continuing involvement" with the SIVs it offered, in fact, Citigroup was implicitly required to absorb any losses from its SIVs and thus should have disclosed the SIVs as a potential liability to investors such as Plaintiffs. Citigroup also failed to fully and accurately disclose the impairment of its SIV assets after taking them onto its balance sheet. At a minimum, Citigroup's late and inadequate disclosure of regarding SIVs is an indicator of inadequate internal systems and controls.

57.     Williams and his Advisors specifically relied on these false and misleading disclosures regarding the Company's SIVs.

58.     Third, Defendants' public filings and statements misled investors as to the quality of its Citigroup's residential mortgage, business and consumer loan portfolio, and materially understated its risks, its impairments and its reserves held for losses.  Citigroup misled shareholders about its mortgage underwriting credit standards and practices which it violated. Citigroup misled investors as to the quality of its mortgage and leveraged loan portfolios.  Citigroup also held as loan loss reserves only what was needed to cover losses that had already occurred, not amounts necessary to protect against all likely losses.

59.     Williams and his Advisors relied on the Company's false and misleading disclosures on this subject as well.

60.     Fourth, Defendants' public filings and statements represented that it was sufficiently capitalized, specifically that it had a Tier 1 capital ratio above 6% (the minimum level to be considered well-capitalized in the industry).  That statement was false in that it failed to account for impairments to its $66 billion in CDO exposure, $100 billion in SIV exposure and leveraged loans, Alt-A mortgages and auction rate securities.  When those exposures were properly accounted for, the truth was revealed that Citigroup was insolvent and required a government bailout to survive.

61.     Williams and his Advisors relied on the Company's false and misleading disclosures regarding its capitalization and solvency.

62.     Fifth, Defendants' SEC filings and earnings reports—which were reviewed by Williams' Advisors—represented that the Company's financial statements complied with Generally Accepted Accounting Principles ("GAAP") and SEC accounting regulations.  This representation was false in that Citigroup's accounting of its subprime exposure, impaired assets, leverage and capital ratios all violated GAAP in a number of respects, and it engaged in numerous deceiving accounting methods to mislead investors abut its true financial health and condition.

63.     Sixth, Defendants misrepresented the sufficiency and strength of its risk controls and systems which, in cause or effect, contributed to its disclosure failures. Citigroup used materially flawed data and calculations which yielded untrue and inaccurate forecasts of its existing and future exposures.  Shareholders, including Williams, expected Citigroup to have state-of-the-art systems commensurate with the size and scale of its business.

1.      **Introduction—Citigroup's Subprime Business**

64.     Since as early as 2006, Citigroup was engaged in massive subprime mortgage underwriting. "Subprime" generally refers to mortgages made to high-risk borrowers with low credit scores who do not qualify for prime interest rates. Subprime mortgages may also exhibit one or more of the following characteristics which further make them high risk: weak credit histories of the borrower typically characterized by payment delinquencies; previous charge-offs, judgments or bankruptcies of the borrower; high debt-burden ratios; or high loan-to-value ratios.

65.     In his testimony before the FCIC, Richard Bowen ("Bowen"), Citigroup's former Business Chief Underwriter for its Lending Group, testified that he was responsible in 2006 and 2007 for quality control over the mortgage loans and pools which Citigroup purchased from correspondent mortgage originators. Based upon his reviews, he testified that, in 2006, approximately 60% of the loans underwritten were defective in that they did not meet the Company's credit standards and policies, and, in 2007, this percentage rose to 80%. Bowen also testified that Citigroup effectively changed its practices and purchased over $50 billion annually of subprime mortgages and pools of subprime mortgages that did not formerly qualify or meet its quality standards, yet were approved in any event. He testified that this change in standards was the result of internal pressure placed on employees to increase productivity and growth in underwriting.

66.     Bowen also testified that he issued several written warnings to Citigroup's senior managers about the risks from these mortgages warning that there were "resulting significant but possibly unrecognized financial losses existing" within Citigroup. On November 3, 2007, he was so concerned that he sent a detailed email warning to

Citigroup's senior officers and audit committee.  Bowen also requested an outside investigation of the practices he observed because he was worried about the risks of these practice and potentially devastating consequences to shareholders.  These warnings were ignored by senior management and public statements and filings never acknowledged the huge risks to which Bowen had alerted the Company.

67.     These subprime mortgages and pools which Citigroup purchased were the "raw product" which went into various structured and pooled investments that it underwrote, such as residential mortgage-backed securities ("RMBS"), asset-backed securities ("ABS") and CDOs, and then sold to primarily institutional investors.

68.     Relatedly, by 2006 and 2007, Citigroup had become one of the largest CDO underwriters on Wall Street.  CDOs are pools of securities (often backed by subprime loans or pools of loans) that are packaged together which then issue different tranches of securities that are subordinate to each other.  The different tranches each have different rights to cash flow from the mortgage payments, different credit ratings and different levels of potential risk and return. Generally, the higher tranches receive cash flow first, have greater protection from defaults and thus receive lower rates of return. The lowest tranches, referred to as the "equity," bear the greatest risk of default and generally pay the highest yield to investors.

69.     Typically, Citigroup created a CDO from its inventory of RMBS, ABS or other securities backed by subprime loans, including other CDOs.  Citigroup also earned profits from fees that it charged to manage CDOs, and would even keep a CDO tranche that it could not sell to investors.

70.     By 2006, most of the underlying collateral backing CDOs that Citigroup underwrote was subprime mortgages or pools of subprime mortgages. Upon purchasing or underwriting mortgages or pools of mortgages, Citigroup's practice was to perform credit reviews that, if performed properly, would have detected and revealed that the mortgages and pools consisted mostly of subprime borrowers.

71.     Unlike other conventional CDOs, Citigroup began using a type of option when it underwrote and sold its CDOs, called a "liquidity put." This liquidity put allowed a buyer of the Company's CDOs to sell them back to Citigroup, the issuer, at the original value. Citigroup offered this liquidity put to CDO buyers so that it could manufacture demand for its issues, as it offered an effective "guarantee" against losses.

72.     During the summer of 2007, in reaction to the subprime market crisis, the holders of the liquidity-put CDOs began to return these CDOs to Citigroup because of the substantial subprime exposure from the underlying collateral. Citigroup was forced to take back the liquidity-put CDOs. These liquidity-put CDOs comprised approximately $25 billion worth of Citigroup's subprime-related securities.

73.     Citigroup's $55 billion of subprime exposure in 2007—and the main source of its problems—was found in two separate areas of the firm. The first "bucket," totaling $11.7 billion, included securities tied to subprime loans that were being held or warehoused, until they could be added to debt pools for RMBS, CDOs or other offerings to investors. The second "bucket," totaling $43 billion, covered so-called "super senior" securities which were tranches of CDOs that were primarily backed by subprime RMBS collateral that it had underwritten and could not sell.

2.    **Citigroup's Failure To Truthfully Disclose Its Subprime Exposure**

74.    Until November 2007, Citigroup hid and failed to disclose the existence of the $55 billion in subprime mortgage exposure and assets it had on its books.  Citigroup misrepresented the risks associated with these subprime assets, and knew that these assets were impaired. Instead, during most of 2007, Citigroup presented a false and misleading picture of its existing balance sheet, assets, financial condition, risks and exposure from the subprime crisis, as well as its further exposure.

75.    For example, on January 19, 2007, Citigroup issued a press release announcing its financial results for the year and fourth quarter ended December 31, 2006. The press release highlighted the "double-digit revenue growth in [Citigroup's] corporate and investment banking, wealth management and alternative investment businesses…" and the "positive trends from [Citigroup's] strategic actions."  The press release assured investors that the bank was "remaining highly disciplined in credit management."

76.    During a conference call with investors that same day, a UBS analyst questioned why loan loss reserves had not changed when there had been an increase in Citigroup's consumer loans.  Citigroup responded that it believed that it had "adequate reserves" and that it felt "very good" about its reserves.

77.    On February 23, 2007, Citigroup filed its Form 10-K for the year ended December 31, 2006.  Commenting on its outlook for 2007, the Company announced that it was entering 2007 with "good business momentum."  In fact, the Company explained that from 2004 to 2005 "[subprime] mortgage originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers."

78.     On April 16, 2007, Citigroup issued a press release reporting net income for the quarter ended March 31 of $5.01 billion, or $1.01 per share. Citigroup stated that it had "generated strong momentum this quarter" including record revenue and growth.

79.     On April 16, 2007, Citigroup held an investor conference call to discuss the Company's results for the first quarter.  Williams' Advisors attended this conference call.  During the call, an analyst questioned whether $9 billion worth of Citigroup's loans were "no documentation" or "low documentation" subprime loans.  Crittenden implied that these loans were profitable, that the Company did not view them as a risk and that there was no difference in their "delinquency performance."  Based on these statements, Williams' Advisors came away from the conference call believing that Citigroup was insulated from any meaningful risk from "toxic" subprime assets.

80.     Citigroup's press release and conference call led its investors to believe that its risk and loss exposure to subprime loans was minimal, and that the quality of its mortgage portfolio was high.  Williams was among those who reached this conclusion based on the Company's public statements and filings.   Paul Nolte, director of investments at a money management firm, was quoted on April 16, 2007 in a *CNNMoney.com* article stating "[o]ne of the question marks coming into earnings season has been the mortgage issue, and Citigroup making positive comments about its business has lent some strength to the overall market."

81.     Most importantly, during these first two quarters of 2007, Citigroup failed to disclose the $55 billion in subprime assets it held, which included $17.1 billion of subprime assets held by Citigroup's Global Structured Credit Products Division, $14.6 billion of super senior tranches of CDOs and $23.2 billion of liquidity-put CDOs.

Citigroup's senior management was fully aware of this exposure from internal reports and yet failed to disclose this information to shareholders.

82.     On July 10, 2007, the *Financial Times* published an article quoting Prince's cavalier attitude regarding the turmoil in the subprime market and its implications for leveraged finance.  Prince stated, "[w]hen the music stops, in terms of liquidity, things will be complicated.  But as long as the music is playing, you've got to get up and dance.  We're still dancing." Prince added that there was so much liquidity at the moment that the "party" would not be disrupted by turmoil in the subprime market.

83.     On July 20, 2007, the Company issued a press release reporting net income for the second quarter of 2007.  The Company announced record revenues and an 18% increase in both net income and earnings per share.  The press release also reported, as to Citigroup's Securities and Banking segment, *decreasing* credit costs "reflecting a stable global corporate credit environment."

84.     Crittenden further stated in the July 20, 2007 conference call that:

> Our sub-prime exposure in Markets and banking can be divided into two categories….  With regards to secured lending, we have been actively managing down our exposure for some time. We had $24 billion in assets at the end of 2006.  It was at $20 billion at the end of the first quarter and $13 billion at the end of the second quarter, while adjusting at the same time collateral and margin requirements.

85.     This statement materially understated Citigroup's subprime exposure.  The $13 billion in subprime assets it did disclose failed to include its trading exposure, the $14.7 billion from the super senior tranches of CDOs and the $24.5 billion of exposure it had from liquidity puts.  In truth, Citigroup held approximately $52 billion of subprime-

exposure while shareholders were misled to believe that total exposure was three times smaller.

86.    Moreover, Citigroup's statement that it had reduced its exposure from $24 billion to $13 billion was false and misleading because a portion of the reduction resulted from the fact that Citigroup took unsold lower-rated tranches of previously underwritten CDOs, as well as warehoused subprime RMBS, and repackaged those assets in a newly created CDO.  Citigroup then retained the super senior tranche of this new CDO, which it excluded from its subprime exposure calculations. Through repackaging, Citigroup had made its subprime exposure "disappear," even though it was still on its books.

87.    On October 1, 2007, Citigroup pre-released earnings and prepared a recorded call.  The purpose of this announcement was to prepare shareholders for write-downs and charges to earnings that it was forced to take.   However, Citigroup's announcement and recording were drafted by its senior managers in a way that would not disclose the direct subprime exposure they had through super senior tranches.

88.    Citigroup's announcement stated that dislocations in the mortgage-backed securities and credit markets and deterioration in the consumer credit environment were expected to have an adverse impact on third quarter financial results. Citigroup estimated that it would report a decline in net income in the range of 60% from the prior-year quarter. The Company's stated losses included write-downs of approximately $1.4 billion on funded and unfunded highly leveraged finance commitments. These commitments totaled $69 billion at the end of the second quarter and $57 billion at the end of the third quarter; losses of approximately $1.3 billion on the value of subprime mortgage-backed securities; and losses of approximately $600 million in fixed-income credit trading.

Citigroup also announced that consumer credit costs rose to approximately $2.6 billion, due to continued deterioration in the credit environment, organic portfolio growth, and acquisitions.

89.    Again, Citigroup failed to disclose its $55 billion in subprime exposure despite the fact that the Company had just been forced to buy back $25 billion of commercial paper assets due to liquidity puts. Notwithstanding, Prince put a positive spin on the quarterly results.  He told investors that markets were recovering and Citigroup expected a "return to a normal earnings environment in the fourth quarter" and "[t]he decline in income was driven primarily by weak performance in fixed income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs."

90.    On October 15, 2007, Citigroup issued a press release reporting disappointing third quarter results.  The press release reported net income of $2.38 billion, a decline of 57% from the Company's prior year results, and noted $1.56 billion of pretax losses tied to loans and subprime mortgages that were to be repackaged and sold to investors.  Yet again, Citigroup failed to disclose its $55 billion in subprime exposure.

91.    During 2007, Citigroup's senior managers received internal reports which detailed its subprime assets and holdings.  The Company's senior managers knew that its subprime holdings were impaired or worthless as a result of the following:

- Super Seniors—Citigroup accumulated billions of the super senior tranches of subprime CDOs because, with the lower yield, it could not sell them. The collateral in these CDOs was thin, close to the bottom in low-rated RMBS subprime tranches. Citigroup valued these at par and failed to disclose this to investors, despite the fact

that they were impaired since early 2007 because of the risk from the underlying collateral.

- Junior Interests—by February 2007, Citigroup held $5 billion of junior CDO tranches which it could not sell so it resecuritized them into four new CDOs, then tried to obtain insurance for the super senior tranches of the new CDOs because they were at risk or impaired.

- Commercial Paper CDOs—from 2004 through 2005, Citigroup underwrote $28 billion of CDOs in which the super seniors ($25 billion) were commercial paper which carried a liquidity put guarantee that Citigroup would repurchase the paper if the collateral had a problem.  Citigroup earned $375 million in underwriting fees, and was paid $50 million per year for the liquidity-put guarantee. Citigroup moved $25 billion of this commercial paper off its books, but was always at risk for it to be put back, which happened in mid-September 2007. Notwithstanding, that these were put back, Citigroup failed to disclose the risks from these assets.

- Mezzanine CDOs—from 2005 through 2006, Citigroup underwrote $19.64 billion in Mezzanine CDOs ($12.76 billion were super seniors) which it never sold.  By March 2006, these were worthless and the super seniors were 50% impaired due to poor credit quality.

- High Grade CDOs—in late 2006 to early 2007, Citigroup underwrote $14 billion of High Grade CDOs and sold none.  These were full of the junior tranches of the Mezzanine CDOs it could not sell.  Citigroup High Grade CDOs came to hold 40% of CDO tranches—19% is average—which degraded the assets.

- Hedged CDOs—in 2007, Citigroup offered $8 billion of new securitizations from existing tranches it could not sell.  Citigroup sought to swap its risk off to financial insurers.  These assets were worthless at the time of Citigroup's effort to swap off the risk.

- Forais Funding—in February 2007, Citigroup created a special purpose entity, Forais Funding, to enter into a credit default swap with Citigroup for the $1.32 billion super senior tranche of one of its CDOs.  Citigroup paid Forais a premium to swap off the credit risk.  Citi then tried to sell a large block of Forais notes in a CDO, the last subprime CDO issued in July 2007.

- AMBAC—by May 2007, AMBAC likely would be bankrupted by its CDO-related claims. If AMBAC went under, Citigroup likely had no insurance hedge to its $5 billion in Hedged CDOs. In August and November 2008, AMBAC paid Citigroup $1.85 billion to settle claims on $4.9 billion in CDO losses. These Hedged CDOs had no real hedge.

- ABX and TABX—by March 2007, these indexes tracking RMBS and Mezzanine CDO tranches showed declines demonstrating that RMBS and CDOs with mortgages faced problems due to mortgage quality deterioration. Citigroup's own analysts issued reports on how bad 2006 subprime mortgages had become, and Fitch /Moody's issued similar reports.

**3.     Citigroup Makes Its First Disclosure Of Subprime Assets With $8 to $11 Billion Of Write-downs**

92.     During early 2007, Citigroup knew that its CDOs had become impaired as a result of the subprime crisis. The market for structured securities (CDOs, RMBS and ABS) with subprime holdings vanished. As a dealer in these securities, Citigroup knew that there were few, if any, buyers of structured securities with subprime collateral. Citigroup also knew that various CDO tranches had become unmarketable, so it repackaged the securities in an effort to make them salable. Notwithstanding, Citigroup persisted with failing to disclose the full extent and impairment of its subprime exposure.

93.     On November 4, 2007, Citigroup suddenly issued a press release which, for the first time, disclosed that the magnitude of its subprime exposure was substantial and more than three times its previous disclosures. The press release stated in relevant part as follows:

> Citigroup Inc. (NYSE: C) announced today significant declines since September 30, 2007 in the fair value of the approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business. Citi estimates that, at the present time, the reduction in revenues attributable to these declines ranges from approximately $8 billion to $11 billion (representing a

decline of approximately $5 billion to $7 billion in net income on an after-tax basis).

\*\*\*

The $55 billion in U.S. sub-prime direct exposure in S&B as of September 30, 2007 consisted of (a) approximately $11.7 billion of sub-prime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs).

94.     The same day, Citigroup filed its Form 10-Q for the third quarter 2007. The filing revealed that Citigroup was revising the financial results issued on October 15, 2007, revising its net income downward by $166 million.  This was also the first time that shareholders learned of the liquidity-put CDOs.

95.     Also on November 4, 2007, Citigroup issued a press release announcing that Prince "elected to retire from the Company…[and] resigned from his position as Chairman of the Board and Chief Executive Officer effective November 5, 2007 and will retire from the Company effective December 31, 2007." In a memo to employees announcing his resignation, Prince wrote: "It is my judgment that the size of these charges makes stepping down the only honorable course for me."

96.     Just days before Prince's "retirement," Citigroup "reorganized its management," pushing out its head of trading and one of its fixed income chiefs. These ousters were the likely result of these managers' failures to properly monitor and manage subprime risk, which was within their purview.

97.     A November 6, 2007 *Bloomberg* article, entitled "Citigroup's Subprime Explanation Defies Belief", described the Company's position.   The article states: "Citigroup Inc. says it isn't sure how much its subprime-related assets have fallen in

value this quarter.  Maybe it's $8 billion.  Maybe it's $11 billion.  On one point, though, Citigroup isn't budging:  It says none of these declines began until after last quarter ended….  It's as if we're supposed to believe that all this stuff at Citigroup happened after September ended ….  And we're supposed to believe Citigroup's brass didn't have a clue any sooner."  The article's author scoffed at Citigroup's attempt to point the finger at the ratings agencies and called the assets "toxic waste" that Citigroup "gorged on during the subprime-mortgage binge."

98.    On July 29, 2010, the SEC filed a Complaint against Citigroup for its material misstatements of its subprime exposure during 2007 up until the November 4, 2007 announcement. The SEC Complaint eventually resulted in a $75 million settlement.

### 4.    Citigroup's Delayed Disclosure of More Impaired CDOs

99.    On January 15, 2008, Citigroup revealed another $11 billion in CDO exposures which brought its total to $66 billion.  Citigroup also announced that it would take an additional $18.1 billion write-down for the fourth quarter 2007. According to the Company, the results reflected write-downs on subprime-related direct exposures in fixed income markets and increased credit costs related to U.S. consumer loans.

100.    Citigroup's $11 billion in CDO exposures represented primarily its Hedged CDOs which were supposedly hedged under financial guarantees by monoline insurers, AMBAC and MBNA.  When these counterparties suffered credit downgrades, Citigroup was forced to reveal the existence of these CDOs and take a $1.5 billion adjustment or write-down.

101.    During the rest of the year, Citigroup would eventually disclose another $13 billion in write-downs of subprime CDOs for total write-downs of over $31 billion.

These delayed reports occurred despite the fact that Citigroup had knowledge of their impairment far earlier, thereby stringing shareholders along to prevent a steep decline or crash in its stock price.

102.    Citigroup's delayed write-downs were likely the result of false and misleading "fair valuations" performed by the Company on its assets.  As a "mark" on its assets, Citigroup's used valuations which did not accurately or truthfully reflect market conditions, so that its results were materially inflated and misleading to investors.  The true extent of its actual CDO impairments was not fully disclosed until early 2009, when the details of the government bailout were released.

### 5.    Citigroup's Failure To Disclose Its SIV Exposure

103.    During 2007, Citigroup also failed to disclose the subprime assets and risk exposure it faced from SIVs that it had established. An SIV is a separate legal entity with a separate balance sheet that is traditionally used by a bank, like Citigroup, to help finance low-risk assets such as credit card loans. Citigroup used SIVs to borrow cash by selling short-term (30-, 60- or 90-day) commercial paper to investors, while the proceeds were used to buy longer-term, higher-yielding assets that were held inside the SIV.

104.    Since at least as early as 2006, Citigroup had invested billions of dollars in subprime loans, pools and RMBS for its CDO portfolios. Citigroup placed billions of dollars of such underperforming and/or nonperforming assets in off-balance-sheet SIVs, and then, in turn, issued commercial paper on the SIVs to large institutional investors.

105.    Historically, SIVs underlying assets were relatively low risk, and they had very low profit margins.  When Citigroup and others saw the opportunity for greater profit, they increased the risks and purchased riskier borrowings in SIVs, such as home-

equity loans and subprime mortgages. Citigroup engaged in these risky practices to reap short-term profit at the expense of its long-term viability and risk to its highly valued SIV clients.

106.   Citigroup was closely affiliated with these SIVs which it had arranged and managed, and placed some of its largest customers. The SIVs were rated by credit agencies due to their affiliation with Citigroup, and the understanding that it provided a liquidity back-stop for its SIVs. Citigroup likely could not have sold these SIVs to investors were it not for its backing. Accordingly, due to explicit and implicit guarantees it had made, Citigroup should have consolidated its SIVs on its balance sheet under accounting rules.

107.   During 2007, Citigroup's SIVs faced problems as the commercial paper market dried up from investor fear about the underlying subprime assets, and the SIVs also could not sell the underlying subprime assets.  Citigroup had 25% of the SIV market, and led efforts to establish a "rescue fund" among banks, where it offered to assume a first-loss position. By these actions, Citigroup admitted that it was liable for its SIVs.

108.   On October 15, 2007, during a conference call, Crittenden admitted that Citigroup had taken some commercial paper from SIVs onto its balance sheet.  Crittenden stated that it would only consolidate those SIVs where it had some kind of contractual commitment to do so. This misled investors into believing that Citigroup would not consolidate all of its SIVs, which it later did.

109.   In its November 5, 2007 Form 10-Q, Citigroup disclosed that it had extended $10 billion in financing for its SIVs, and that $7.6 billion had been drawn.

Citigroup again stated that it would not take action to consolidate SIVs onto its balance sheet.  Williams and his Advisors relied on this false and misleading representation.

110.   On December 13, 2007, Citigroup announced that it was transferring $49 billion in SIVs onto its balance sheet (which was down from $66 billion weeks earlier and $100 billion at the end of the second quarter). Prior to this point, Citigroup had failed to disclose the extent of its potential exposure to SIVs or the risks of the underlying assets.

111.   Citigroup's disclosure failures regarding its SIVs were material to investors and untrue because of shareholders were not given full disclosure regarding the extent of potential liability and/or the likelihood of consolidation until after-the-fact.  Citigroup also misled shareholders about the likelihood of consolidation of the SIVs.

112.   At the time of this disclosure, it was highly probable that Citigroup would assume liability for all of its SIVs, regardless of whether it had any contractual commitment or not.  Citigroup had explicitly and/or implicitly guaranteed the SIVs, had reputational liability for these SIVs which were sold to many of its largest customers and/or had *de facto* legal liability for the SIVs. Citigroup's representations that it would not consolidate these assets on to its balance sheet were thus false and misleading, as was its failure to disclose its likely SIV exposure far earlier.

113.   After Citigroup did transfer over its SIV assets, these became part of its balance sheet. Citigroup subsequently failed to fully disclose the underlying risks relating to the SIVs' subprime assets which it assumed.  These disclosure failures persisted through out 2008, while Citigroup painted a false picture of financial state and prospects for recovery.

114.   On November 19, 2008, Citigroup disclosed that the SIVs were so impaired it could not find a buyer. Citigroup paid $17.4 billion to wind down the SIV assets on to its balance sheet, then wrote down another $1.1 billion.

**6.      Citigroup's Further Failure To Disclose
         Its Troubled Financial Condition**

115.   It was not until the end of 2008 that Citigroup's full exposure during the subprime crisis, and the consequences from its exposure, were revealed.  During 2008, Citigroup slowly revealed its troubled condition to shareholders while, at the same time, putting a positive spin on its financial state and turnaround.  Citigroup did not truthfully and accurately report and account its impairments, but made piecemeal disclosures. Citigroup also engaged in numerous accounting manipulations to maintain the false appearance of a strong recovery. Citigroup's collapse has been the subject of several government investigations.

116.   By mid March of 2008, Citigroup announced that it would lay off an additional 2,000 employees, including investment bankers and traders. This brought its reported layoffs at Citigroup's investment bank since the mortgage crisis began to more than 6,000—about 10% of its workforce.  By this time, Citigroup had written down the value of its assets by $20 billion.  Shareholders expected that Citigroup had, by now, revealed to the public the truth regarding its exposure to the subprime crisis.

117.   On April 18, 2008, Citigroup announced continuing losses and the further consequences of its subprime exposure to the public when it revealed its first quarter 2008 financial results.  *The Wall Street Journal* noted that first-quarter profits of Citigroup's wealth-management division had fallen by 33% due to turmoil in the credit markets. It pointed out that Pandit had so far failed to "cleanse its books of toxic assets."

Pandit himself noted that the Company's financial results were "not completely unexpected given the assets we hold."  The article went on to report that the "global consumer group suffered from $6 billion in costs arising from troubled mortgages, home-equity lines, credit cards and auto loans."

118.    Only a few days later, on April 21, 2008, Citigroup was forced to raise an additional $6 billion in the credit markets through an offering of preferred stock.  Then, a few days after that, Citigroup announced that it would need to raise another $3 billion in capital by selling common stock.  Citigroup tried to spin these as positive capital infusions to the Company.

119.    On May 9, 2008, Pandit made his first major presentation to shareholders since taking over the Company.  His presentation focused on his plans and efforts to turn around the Company. Again, he failed to disclose the seriousness of Citigroup's troubles and painted for investors a misleading picture of the Company's current status and future prospects.

120.    On July 18, 2008, Citigroup announced that it lost $2.5 billion, or $.54 cents a share, in the second quarter.  According to *The New York Times*, "[t]he loss was largely caused by $7.2 billion of write-downs of Citigroup's investments in mortgages and other loans and by a weakness in the consumer market, which cost Citigroup $4.4 billion in credit losses and $2.5 billion to increase reserves."

121.    As a result of the second quarter results, Citigroup's total losses exceeded $56 billion in credit losses and write-downs in the last four quarters.  During this time, the Company had lost more than $17 billion and watched its share price plummet nearly

70 percent since the credit market began to tighten.   Nevertheless, Citigroup's shares traded at $23 per share in early October 2008.

122.   On November 17, 2008, Citigroup announced that even after recording more than $32 billion of write-downs on the assets described above during 2007 and 2008, it would no longer mark-to-market $80 billion of mortgage-related assets. Citigroup's decision to stop marking these assets to market was an admission that these assets were worth dramatically less than reported, and that Citigroup lacked the capital to absorb the losses that would occur if it properly valued these assets.   Inexplicably and without any justification, Citigroup still failed to declare the assets impaired or write them down.

123.   During the ensuing months, however, Citigroup continued to announce staggering losses.  For example, on January 16, 2009, Citigroup reported a net loss for the 2008 fourth quarter of $8.29 billion due to continuing write-downs and losses.  The poor results also included $6.1 billion in net credit losses and a $6 billion net loan loss reserve build.  For the full year 2008, Citigroup reported a net loss of $18.72 billion.

124.   In November 2008, federal regulators announced that the government had approved a bailout plan to stabilize Citigroup in an arrangement in which the government could soak up billions of dollars in losses at the struggling bank.   In fact, the government had agreed to provide the Company with $45 billion.  By the beginning of March 2009, the government agreed to convert some of the preferred stock it owned in Citigroup to common shares, gaining a 36-percent stake in the Company and boosting Citigroup's buffer against future losses.

125.    Throughout the end of 2007 and nearly all of 2008—including just days before the government was forced to guarantee Citigroup's loans and securities—the Company repeatedly assured investors it was well capitalized and possessed ample funds to withstand any losses.  Threats to Citigroup's solvency and capital adequacy—the basic measures of viability for financial institutions like Citigroup—were concealed while the Company misled investors during most of 2008 and early 2009 about its financial health and condition.  Williams was among the investors the Company misled regarding its capital levels and solvency.

**7.      Citigroup's False Statements Regarding Its
Mortgage Underwriting Practices And Portfolio**

126.    In 2005, Citigroup aggressively expanded its Alt-A and subprime loan production, and became the fourth-largest mortgage originator.  Citigroup's channel loans in 2005 were $69 billion, in 2006 they were $88 billion and in 2007 they were $94 billion.  During this period, Citigroup began underwriting loans of poor quality with low FICO-score borrowers, high loan-to-value ratios and no- or low-documentation loans. Many of these loans began to experience early payment defaults.

127.    Citigroup failed to disclose to its shareholders the increased losses on its mortgages or defaults, or the material decline in quality associated with its loan portfolio due to the *de facto* undisclosed change in its underwriting credit standards and practices.

128.    Citigroup's  disclosure  failures  were  corroborated  by  Bowen's Congressional testimony discussed above.

129.    By the second quarter of 2007, Citigroup knew that 50 percent of its home equity lines of credit were impaired, an impairment of approximately $2 to $4 billion.

130.    Citigroup also knew that it had filed numerous lawsuits against loan originators because of problems with loans and problems with underwriting standards.  In one case, Citigroup delayed filing lawsuits by as much as two years and by doing so was able to avoid having to mark down loans as impaired.

131.    Despite this and other knowledge, Citigroup publicly described its mortgage loan portfolio as "high quality" and performing. For example, on the November 5, 2007 conference call, Crittenden described the Company's subprime loans as "performing." This statement, relied upon by Williams' Advisors, was false, as Citigroup's warehouse loans were 90 days deficient or more.

132.    During 2008, Citigroup reported increasing credit and mortgage losses and expenses and had to increase its loan loss reserves each quarter.  Nonetheless, Citigroup failed to fully disclose the deteriorating and impaired quality of its loan portfolio, the risks and expenses associated with it, or the inadequacy of its loan loss reserves.

133.    Instead, Citigroup continued to mislead investors about the quality of its loan portfolio, and the sufficiency of loan loss reserves.

134.    During the relevant time period. Citigroup failed to take appropriate loan loss reserves under GAAP.  Citigroup took loss reserves against past losses, not for further anticipated losses.

135.    Citigroup also failed to properly "stress test" assets when calculating loss reserves.  Evidence concerning this failure was included in the FCIC Report.

136.    Of the approximately $301 billion in assets that were guaranteed in the government bailout, nearly one half of this amount represented Citigroup's mortgages. Citigroup never disclosed to shareholder this enormous impairment or risk until early

2009, when it was revealed in the details provided on the assets covered by the government guarantee.

### 8.  Citigroup's False Statements Regarding Its Leveraged Loan Impairment

137.   During 2005 through 2007, Citigroup also had greatly increased its underwriting and trading in leveraged loans.  These leverage loans took the form of collateralized loan obligations ("CLOs") or pools of business loans used by businesses for buyouts, mergers or other reasons.  Citigroup's leveraged loans suffered from the same credit problems and impairments that affected CDOs.

138.   In October 2007, Citigroup first reported write-downs of $1.4 billion and stated that it held $69 billion in leveraged loans.  Citigroup would eventually write down $5 billion of these leveraged loans in 2008, and its exposure was grossly understated.

139.   Moreover, in April 2008, Citigroup engaged in a "marking the tape" transaction to set an artificially high value on its leveraged loans.  Citigroup purported to sell $12 billion of its leverage loans to private equity firms at $.90 which allowed Citigroup to value its holdings at $.90 (the price of the last sale as indicative of the market).

140.   However, Citigroup guaranteed the buyers of the leverage loans against the first 20% of losses suffered, and also gave the buyers a loan for the purchase.

141.   In sum, Citigroup offered a "no-risk deal" at an inflated value so that it could ascribe a $.90 value to its impaired inventory.

142.   Williams learned of this sale from his Advisors and relied on Citigroup's purportedly honest sale of leveraged loans at to private equity firms at a price of $.90, as

an indicator that its "troubled" assets were not impaired. Thus, this was material information that misled him and on which he relied to his detriment.

**9.** **Citigroup's False Statements Regarding Its Alt-A RMBS Impairment**

143. Before April 18, 2008, Citigroup failed to disclose that it had $22 billion in Alt-A RMBS that were impaired and at risk. The Company then wrote down its Alt-A RMBS by only $1 billion. Later, during 2008, Citigroup would write down $3.8 billion of its Alt-A RMBS, and yet never disclosed that $11 billion was impaired.

144. Finally, on November 24, 2008, at the "Town Hall Meeting," Citigroup announced that it was reclassifying $80 billion in assets "held to maturity." Unbeknownst to investors, this $80 billion included $11 billion of its Alt-A RMBS. Citigroup only later revealed that its Alt-A RMBS was part of this recategorization on January 16, 2009, when it released information as part of its deal with the government. The government guaranteed this $11 billion in Alt-A RMBS.

145. Citigroup failed to disclose that its Alt-A RMBS had impairments far earlier. As early as Fall 2007, credit agencies were reporting on the collapse of Alt-A mortgages and declaring them to be as risky as subprime because many were "no-document" or "low-document" loans.

146. On a January 22, 2008 conference call, Crittenden acknowledged that Alt-A was risky but did not give specific disclosure on amounts because, he stated, the amounts were not large enough to warrant disclosure.

147. During the Fall of 2008, Citigroup was valuing its Alt-A portfolio at $.66, Lehman was valuing at $.39, Morgan Stanley at $.35, and Goldman Sachs at $.50. Based on these values, Citigroup should have reported an additional $7 billion in write-downs.

148.    Since early 2007, the quality and lack of transparency of Citigroup's Alt-A mortgages as "low-document" or "no-document" mortgages put these at risk for impairment and write-down.   It failed to disclose this knowledge to its investors, including Williams.

**10.    Citigroup's False Statements Regarding Its Solvency**

149.    During the relevant time period, Citigroup misled its shareholders about its financial solvency and capital ratios.  Citigroup failed to disclose the true extent of the impairment of its various mortgages, RMBS, CDOs, SIVs, Alt-A, ARS and leveraged loans to give a false impression to shareholders that it had sufficient capital and liquidity.

150.    In its fourth quarter 2007 filings, Citigroup reported write-downs of $17 billion, which lessened each quarter thereafter—$12 billion; $7 billion; and $4 billion. Citigroup's total assets were reported as $2 trillion.   These reduced write-downs each quarter gave the false impression that the Company was reducing and eliminating its toxic assets, and "cleaning up" its balance sheet.

151.    Pandit even made numerous public statements to this effect.  For example, he stated that "we raised over $30 billion to strengthen our capital base." Consequently, the Company stated, it "maintained its 'well-capitalized' position with a Tier 1 capital ratio of 7.12% at December 31, 2007."   In fact, the Company's CDO securities were supported by subprime mortgages with rapidly increasing delinquency rates, and thus were virtually unsellable, and the Company was not well capitalized.

152.    Thereafter, in a Form 8-K filed with the SEC on April 18, 2008, Citigroup assured investors that the Company's capital position was strong and asserted that the Company had "taken decisive and significant actions to strengthen [its] balance sheet."

153.    The Company's Form 10-Q filed with the SEC on May 2, 2008 reiterated Citigroup's first quarter results and "well-capitalized" status.

154.    In a Form 8-K filed with the SEC on July 18, 2008, Citigroup reported a second quarter net loss of $2.5 billion, or half of the loss that had been reported in the first quarter. Citigroup touted that these "results improved substantially versus first quarter 2008 due to lower write-downs," which declined 42%. Pandit assured investors that Citigroup was "demonstrat[ing] strength in [its] core franchise."  In fact, Citigroup "cut [its] second quarter losses in half compared to the first quarter."

155.    Citigroup filed a Form 10-Q with the SEC on August 1, 2008 that reiterated and emphasized the Company's "well-capitalized" status.

156.    These statements were materially false when made.  Only four months later, Citigroup required the largest government bailout in history precisely because its mortgage-related assets were so deeply impaired that they had effectively rendered the Company insolvent.

157.    On October 24, 2008, Citigroup took $25 billion in money from the government under the Troubled Asset Relief Program.

158.    In November 2008, Citigroup recategorized $80 billion of assets, an acknowledgement that the assets were impaired.  Citigroup decided to recategorize these assets because it simply could not afford to write them down.

159.    On November 24, 2008, Citigroup announced that the government would guarantee $306 billion in assets, and the government gave Citigroup an additional $20 billion in cash.

160.   Citigroup's reporting of its revenues and earnings was made without disclosure of the underlying risks associated with those earnings and revenues—namely, its holding of the assets.  Thus, Citigroup's financial condition falsely looked good as it earned revenues with no apparent risk.  Citigroup did not disclose the full extent of its mortgage risk, and understated its risk capital and value at risk.

161.   Citigroup violated GAAP and/or SEC accounting regulations and standards, among other things, by: i) overstating the fair value of its CDOs and Citigroup's total assets; ii) failing to consolidate the SIVs; iii) failing to disclose concentration credit risk from CDOs; iv) understating loan loss reserves; v) failing to disclose ARSs' exposure; and vi)overstating the adequacy of Citigroup's capital.

**11.    Citigroup's Misled Investors About Its Risk Controls**

162.   During the relevant time period, Citigroup further misrepresented the sufficiency and adequacy of its risk controls and risk management.  Citigroup apparently relied upon credit ratings, rather than an independent analysis of the underlying assets. The Company's risk systems also did not analyze its assets for underlying credit risk.

163.   Citigroup's trading book did not heed warnings from its mortgage originations.

164.   Citigroup applied a discount rate for its stress tests which was an amalgam of CDOs, CLOs and other assets with better credit quality.  Citigroup ignored the ABX and TABX for its discount rates.

165.   Citigroup also represented in its prospectus that it performed stress testing with factor sensitivities, Value at Risk and Stress Testing.  An OTS Officer testified to the Senate that the stress testing performed was inadequate.

166.    A February 28, 2008 *Wall Street Journal* article described Citigroup's risk oversight as it related to its staggering losses.  It noted that while the Company's value-at-risk ("VAR") was not out of line with other firms, its "figures don't include [its] exposure to collateralized debt obligations—which were responsible for nearly $20 billion in investment-banking losses last year…."

167.    On April 8, 2008, *The Wall Street Journal* reported that Citigroup was making changes to its audit committees due to mistakes in overseeing the Company's risk management processes.  The Company ousted the chairman of the audit committee in light of allegations that he had "failed to adequately oversee the bank's risk-management processes and therefore is partly to blame for mistakes that have battered Citigroup in recent months."  The article pointed out that though the Company had, by then, endured more than $20 billion in losses, "some directors weren't aware of the company's exposure until huge write-downs started piling up…[which] experts say is a big failure."

168.    The reality of Citigroup's risk controls belied the representations made by the Company to investors, and its failures led to false and inflated "fair values" or "marks" on its assets, insufficient write-downs of impaired assets and insufficient loss reserves.

## V.    PLAINTIFFS' DETRIMENTAL RELIANCE ON DEFENDANTS' MISLEADING STATEMENTS

169.    On a regular basis, Williams and his Advisors received direct information and communications about Citigroup from the Company itself, through conference calls, investor slideshows, earnings releases, public filings and statements from senior officers. Frequently Williams also received information from his Financial Advisors who spoke directly to senior Citigroup corporate officers. Williams made all

of the investment decisions to hold, sell, borrow against, hedge, transfer to a trust or to otherwise deal with Plaintiffs' Citigroup shares, based entirely upon information and representations disseminated directly from the Company and its senior officers to him and his Advisors.  In this sense, Williams' Financial Advisors functioned primarily as conduits of information regarding Citigroup, the channels through which Citigroup disseminated its communications to Plaintiffs.

170.    In the middle of May 2007, Williams decided to liquidate his entire 17.6 million share position in Citigroup.  He took concrete preparatory steps to implement the sale, beginning with the sale on May 17, 2007 of one million shares at $55 per share.  Thereafter, he canceled the remainder of the planned sale in reliance on false and misleading positive information issued by Citigroup by way of certified public filings and statements by the Company's senior officers.  Namely, Williams and his Financial Advisors combed through Citigroup's filings and statements to see whether it had meaningful exposure to the subprime mortgage assets that were beginning to drag down other major players in the financial services sector.  Trusting that the Company's public pronouncements were forthright and that it had no exposure to those "toxic" assets, Williams reversed course and decided to hold the remainder of his shares.

171.    Based on an event study conducted using widely accepted analytical methods approved by courts in this jurisdiction and many others, it appears that the true value of the stock on May 17, 2007, *i.e.*, the "fraud-free price" if Citigroup had honestly disclosed its subprime exposure, would have been $51.59.

172.    In March 2009, by which time William's faith in the truthfulness of the Company had finally been erased, he sold his remaining 16.6 million shares at a price

of $3.09 per share.  As such, Plaintiffs' damages are the difference between $51.59 and the $3.09 per share they ultimately received: $809,950,000.

173.    In the alternative, Plaintiffs' damages may be calculated on a net out-of-pocket basis.  In that case, the damages would be calculated based on the price at which Williams acquired the shares in 1989, $35 per share.  Using this out-of-pocket damages theory, their losses are the difference between $35 per share and the $3.09 per share they ultimately received: $532,897,000.

174.    In May 2007, Williams had decided to sell his shares of Citigroup at a price of $55 per share. He had been planning and discussing diversification out of Citigroup for some time, and was worried about the markets and outlook for 2007. He and Angela also had transferred three million of their shares into GRATs that had two-year terms, with the intention of selling these shares. Williams also commenced the first step of his plan to sell his entire position and, on May 17, 2007, sold approximately one million shares at $55 per share. Despite his intention to sell all of his shares, Williams delayed executing his sales when Citigroup's stock price declined as the markets began to experience volatility from the subprime mortgage crisis.

175.    Relying on Citigroup senior officers' false and misleading statements during the most recent conference call held in April 2007, Williams believed that Citigroup had little downside risk and its shares were likely being dragged down by the fortunes of other players in the financial services sector that did in fact have mushrooming problems with subprime assets.  Based on Citigroup's statements, Williams had every reason to believe that the Company was being unfairly lumped in with those other companies, and once the market understood and took into account the

different—and far superior—risk posture of Citigroup, its shares would recover and he could complete his planned sale as intended.

176.    At this April 2007 conference call, Citigroup failed to disclose that it held tens of billions in "toxic" subprime assets.  Instead, Citigroup misled investors by stating that it had very little subprime exposure, that it had avoided the riskier mortgage products and was diligently managing its risk and reserves.  These statements would later be revealed to be untrue.  As the subprime crisis unfolded, Citigroup falsely portrayed itself as being financially sound and unaffected, so that its stock price would likely return to the $50 range—not collapse—over the upcoming year.

177.    Over the next seventeen months, as he continually tried to choose the appropriate time to complete the liquidation of his position in order to minimize his damages, Williams was misled into holding on to his remaining 16.6 million shares while it fell all the way to $3 per share. During this time, Williams was further deceived by Citigroup about its financial condition, its subprime exposure, the extent of its financial problems and its outlook for a recovery.

178.    In early December 2007, after Citigroup had made its first—and partial—disclosure of its subprime holdings and its CEO resigned, Williams considered selling out his position when the share price had fallen to $33 per share as a means of minimizing his losses. However, Williams elected to hold on to his shares instead because he believed Citigroup's false and misleading statements that it had fully disclosed its troubled assets and write-downs, that its write-downs were only an "accounting issue" with no impact on its cash flow and that the stock had reached its "bottom."

179.    On August 20, 2008, when the price reached $17.50 per share, Williams again considered selling his entire position and took concrete steps to do so, still looking for the right time to minimize his losses.  Again, however, he pulled back at the last moment, relying again on the Company's misleadingly positive public pronouncements.

180.    And finally, when the price reached $8.50 per share on December 2, 2008, Williams placed—and then subsequently retracted—sell orders to liquidate his position.  His retraction was the result of his specific and direct reliance on false statements put forth by Citigroup.

181.    During this entire period, Williams maintained a steadfast trust in the public statements of Citigroup and never believed that the Company would deceive him or issue false statements. In fact, Williams had prior dealings with Defendant Prince and trusted in his words and actions. From May 2007 through December 2008, Williams' decisions to forego selling out his position were the direct consequences of his reliance on Citigroup's public filings, his personal and direct communications with senior Citigroup officers, and the Company's public statements, including those made on investor conference calls.  The foregone proceeds from the May 2007 planned sale are the specific damages induced by Citigroup.

182.    While the value of his stock position declined, Williams, his Family Advisors and his Financial Advisors closely followed Citigroup. They monitored and listened to the Company's quarterly conference calls; they received and reviewed investor slideshows issued by Citigroup; they received and reviewed Citigroup's earnings releases and public statements made by Citigroup's officers in news reports

and articles; they had communications with Citigroup senior executives; and they obtained information from analysts who spoke directly with Citigroup's senior officers. Their analysis and discussions concerning the Citigroup stock were all based upon representations and information originating from the Company. Williams' faith in—and explicit reliance upon—Citigroup's communications and public disclosures ultimately led him down a devastating path, as he lost hundreds of millions of dollars when the stock price collapsed.

183.   Finally, in early 2009, after the U.S. government took over and gained access to Citigroup's books and records, its false and misleading statements about its financial health, exposure, toxic assets and insolvency were revealed. Amid worries of a nationalization or bankruptcy filing and a resulting total loss to shareholders, Williams sold his remaining 16.6 million shares at $3.09 per share.  The loss of value suffered by the Williamses from their planned sale at a price of $55 per share, to their sale of the remaining 16.6 million shares at $3.09, resulted in enormous damage to the Williamses. Citigroup's wrongful acts have destroyed a substantial percentage of the Williamses' net worth

184.   Plaintiffs have specific evidence that they detrimentally relied upon Citigroup's fraudulent and misleading statements.  As described in detail below, during the relevant time period, Plaintiffs and their Advisors regularly reviewed public filings, listened to conference calls, monitored the media and had direct communications with senior Citigroup officers, in order to understand the Company's true financial condition. They undertook these massive efforts in order to make informed decisions whether Plaintiffs would sell or hold their Citigroup position. In so doing, they explicitly relied on

Defendants' public filings and statements and were thereby misled to their great detriment.

### 1.   Williams' Monitoring Of His Citigroup Stock Position

185.   As alleged more fully above, to manage his investments, Williams formed a "family office" which consisted of several dedicated professionals who worked solely for him, his Family Advisors.   One was Williams' former Chief Financial Officer at his insurance company and an accountant with whom he has worked closely for over 30 years.   The other is also a CPA with whom he has worked for over 20 years.   His Family Advisors operate from a dedicated office, and were intimately involved in monitoring and gathering information on Williams' investments, including by far his largest single investment, his Citigroup stock.

186.   In addition, Williams was also advised by a diverse group of private financial advisors from top-tier financial services and investment firms, his Financial Advisors.   These Financial Advisors worked at firms where he held his investments, including his Citigroup stock.   These firms include Credit Suisse First Boston, Wells Fargo, Capital Guardian, Pictet & Cie and others.   The Financial Advisors also were deeply engaged in monitoring and gathering all publicly available information concerning Citigroup, and they regularly reported this information to Williams and his Family Advisors as they weighed whether to sell or hold the position.

187.   During the relevant time period, from early 2007 through the sales of his last shares on March 18, 2009, Williams' Advisors regularly received direct information and communications about Citigroup from the Company itself.   They reviewed and monitored its annual and quarterly report filings on Forms 10-K and 10-

Q. They attended conference calls given by the Company to analysts and select investors. They received earnings releases and investor slideshows from Citigroup with information on the Company. The Advisors also reviewed and monitored news articles on Citigroup, which contained public statements by the Company's officers.

188.    In addition, Williams' Financial Advisors had direct private meetings with senior Citigroup officers and relayed their discussions to Williams. Williams also had periodic discussions with former Primerica colleagues who were now Citigroup senior executives about the Company's financial health, and even had at least one discussion with Prince when they happened to meet. He came away from every one of these conversations believing that Citigroup was a stable, solvent company with an emphasis on risk management and honest disclosure.

189.    Williams made all of his investment decisions to hold, sell, borrow against, hedge, transfer to a trust or to otherwise deal with the Citigroup shares, in specific reliance upon the information and representations made by the Company and its senior officers to him and to his Advisors during this time period. His Advisors also formulated their investment advice, recommendations, opinions and projections based upon information they received directly from the Company, including its public filings and statements. Whether it was Williams himself who was tracking the Company, or one or more of his agents, the flow of information to Williams on which he relied always originated from Citigroup.

###    2.    GRATs Established With View Toward Selling Blocks of Citigroup Shares

190.    In 2006, Plaintiffs were holding 17.6 million shares of Citigroup. These shares represented approximately 60% of the Williamses' net worth. They had received

numerous recommendations from their Financial Advisors to sell their Citigroup stock and diversify their investments. They initiated a plan to sell their shares of Citigroup. They analyzed their options for selling, consulted with tax attorneys and established grantor retained annuity trusts, or GRATs. A GRAT is a trust used in tax planning to minimize gift taxes upon the sale of an appreciating asset.

191.   On March 24, 2006, the Williamses established the first GRAT, and AHW, through Angela, transferred two million shares of Citigroup into it.  This first GRAT was named the "Angela Williams Grantor Retained Annuity UAD Trust March 24, 2006," and Angela was named Trustee. The GRAT had a two-year annuity and terminated on or about March 24, 2008.  After the first year, the GRAT was scheduled to distribute 49.286% of the fair value of its assets transferred to it back to the grantor, and, after the second year, the GRAT was required to distribute 59.1432% of the fair value of the assets transferred to it back to the grantor.  At termination, any excess amounts were to be paid to the Williamses' children.

192.   On April 17, 2006, the Williamses established a second GRAT and AHW, through Angela, transferred in one million shares of Citigroup.  This second GRAT also had a two-year annuity and terminated on or about April 17, 2008.  Angela, the Trustee of the first GRAT, was also named Trustee of the second and was also the grantor of the one million shares of Citigroup that were transferred into the GRAT.

193.   These two GRATs were formed with the intent to sell these three million shares of Citigroup.  The Williams planned to sell the Citigroup shares within GRATs so that they could gift to their children any gains on the sales.

194.     The subsequent collapse in value of the Citigroup stock held in the two GRATs altered these plans significantly. They established new GRATs to hold the initial stock distributions from the prior GRATs as well as the final distributions. In essence, the Williamses "rolled over" the GRATs. The rollovers into new GRATs— rather than sales—of the stock would not have occurred but for Williams' reliance upon Citigroup's false and misleading statements.

### 3.     By May 2007, Williams Was Implementing His Plan To Sell His Entire Citigroup Position

195.     By early 2007, Williams had decided to sell and planned to diversify out of his Citigroup stock. For numerous reasons detailed below, he had concluded that the time was right to exit his position.

196.     Previously, during 2002 to 2003, Citigroup's stock price had experienced a downturn when it suffered through several legal crises, including the notorious "Wall Street Stock Analyst Scandals."  Despite this downturn, Williams held on to Citigroup. Williams had gotten to know Prince personally when he sold his company and trusted in Prince's ability to resolve Citigroup's legal troubles. In the years following 2003, Citigroup's stock had recovered to $40 to $50 per share, and by 2007 Williams believed that its recovery was complete.

197.     During 2003 to 2007, Citigroup had grown considerably through multiple acquisitions. Citigroup had acquired numerous companies in related fields, and embarked on an ambitious plan to be a "one-stop" financial and banking services "supermarket." As Citigroup grew, there were many questions regarding whether management would be able to integrate the companies and realize synergies from its size and diverse business lines. Most analysts believed that Citigroup had reached its growth peak, that it needed

new management and that the stock price would languish at or about the mid-$50s per share range for several years. Williams became convinced that the timing was right for him to exit his position.

198.    Meanwhile, the financial industry experienced a crash in the subprime mortgage sector and markets. Starting in late 2006, mortgage lending companies specializing in originating subprime mortgages began to experience a serious crisis. Investors, banks and financial firms awoke to the fact that there was a U.S. housing market "bubble" that coincided with a deterioration of underwriting standards.  By early 2007, the fear of subprime exposure resulted in disruption of the mortgage and structured products markets, with many analysts and commentators predicting that Alt-A mortgages would be next. Mortgage lending and origination companies began to fail.

199.    Williams and his Advisors noted these events in the markets and decided that it was time to execute his plan to sell his Citigroup shares. Establishing the first two GRATs during 2006 was part of his plan to liquidate the position. Williams had also reduced borrowing he had done against his Citigroup shares, so that the shares could be freely sold.  He awaited the right time to implement his sales.

200.    In February 2007, Williams received an extremely negative report on Citigroup and its ability to execute its "one-stop" financial "supermarket" plan by his Capital Guardian Advisor.  This Capital Guardian Advisor spoke with his firm's analyst, who had personally conferred with Defendant Prince at a private meeting in New York. At the meeting, Prince gave what Capital Guardian believed was an unrealistic and overly optimistic view on Citigroup's progress toward integrating its business lines, as the Company lacked the necessary infrastructure and systems to accomplish the goal.

Capital Guardian believed that the "whole idea [integrating banking and brokerage] was hanging on by a thread," and that Prince was "on his way out."

201.   On April 16, 2007, Citigroup held its earnings conference call for the first quarter.  Williams' Advisors listened to the call and received an investor slideshow directly from Citigroup.  This slideshow contained financial results and other detailed information on the Company.  Citigroup took a restructuring charge and reported an earnings decline of 11% during the quarter.  Citigroup, however, made no mention of its tens of billions in subprime mortgage exposure it had or the grave risks this exposure presented to the Company.

202.   Afterwards, Williams' Family Advisors took a survey from his Financial Advisors to hear their views on Citigroup as informed by Citigroup's public filings and its officers' comments during the conference call.  His Family Advisors sent an email out inquiring "in light of the recent cost reduction report and the 1st quarterly earnings report, how do you view Citigroup as an investment going forward?" The Financial Advisors all had the same or similar opinion that Citigroup had a "credibility gap" with management, and that it was "in the doldrums" and would trade "in a range" for some period.  One Financial Advisor stated "[we] don't want to own Citigroup today." The consensus among his Financial Advisors was that this was close to the "top" for the near-term and a good time for Williams to sell.

203.   As a result, Williams decided it was time to sell his 17.6 million shares. On May 17, 2007, he began by selling a million shares. However, at this point, while Williams believed that Citigroup would not appreciate much further, he did not believe that the stock price was at risk for any substantial decline.  During its most recent

earnings call, Citigroup failed to disclose that it had tens of billions dollars of subprime exposure or the material underlying risks facing the Company from the subprime mortgage crisis.  Indeed, investors listening to the call were left with the impression that Citigroup was largely insulated from the growing subprime crisis.  Citigroup had persuasively—and falsely—portrayed itself as a company that was not at risk of substantial losses or writedowns due to subprime assets.

### 4.     Williams Stopped Selling in Reliance Upon Citigroup's Misleading Statements and Material Omissions

204.   In fact, on the April 16, 2007 conference call, Defendants Prince and Crittenden instead stressed the positive trends from Citigroup's first quarter results and made the following representations[1] about its mortgage exposure:

> Prince
>
> We are a bank. We are in the risk business.  We are not immune to credit cycles.  We are not immune to credit deterioration, and we are managing this side of our business very carefully in light of that external environment.
>
> I feel good about the composition of our portfolio, so not only in the corporate and sovereign area, but especially in the U.S. mortgage area, where we have avoided the riskier products at some cost to revenues in prior years, and I think we are seeing that play out in the results we have on the credit side.
>
> Gary will take you though the details of that in a moment, including the increase in reserves to stay ahead of the trends we see in the credit environment, but I assure you that we remain very diligent in managing our credit exposure.
>
> ***

---

[1] All conference call transcripts quoted herein are the copyright of *Seeking Alpha*,  www.seekingalpha.com.

<u>Crittenden</u>

In our first mortgage portfolio…the quality of the portfolio is very good.  Less than 10% of the portfolio has a FICO score less than 620 and greater than 80% [loan to value] shown in the four cells in the bottom right-hand corner of the grid.

\*\*\*

The graph at the bottom of the page demonstrates that our loan loss reserves and our NCLs as a percentage of the consumer loan portfolio have held steady with our historical performance.

205.    These representations by Citigroup's two senior officers portrayed a company facing no risk at all from the roiling subprime mortgage crisis. The statements also failed to disclose that dire warnings concerning risk management and the likelihood of substantial losses in the mortgage business had been coming from within the Company for nearly a full year. As a result of these statements, Williams did not believe that his stock was at risk for any substantial decline. Had the Company truthfully disclosed the risks it faced or the tens of billions of subprime assets it held, Williams would have fully implemented his sales and selling plan while the stock was trading at $55.  He did not fully execute his sales or plans to sell because he relied on the Company's false assurances of financial health.

206.    In June 2007, the financial markets were hit by news of the collapse of the $1.6 billion Bear Stearns High Grade Structured Credit Strategies and Enhanced Structured Credit Strategies Funds ("Bear Stearns Funds").  This collapse shocked the market because the Bear Stearns Funds were 90% triple-A and double-A investment grade rated funds with enormous undisclosed subprime mortgage holdings.  Panicked investors scrambled to determine whether they had any subprime mortgage exposure, and

notice was served that credit ratings did not accurately reflect the true value of mortgage-related or structured credit assets.

207.    Citigroup's share price dropped slightly, and Williams canceled his sales and selling plan until it recovered from what appeared to be market turmoil with no relevance to, or potential impact on, the Company.  Williams had no idea that Citigroup held tens of billions of undisclosed subprime assets—the *same* type of assets that felled the two Bear Stearns' Funds.

208.    In fact, at the conference call for the second quarter of 2007, Citigroup and its senior managers continued with their false portrayal of the Company as financially secure with no significant risk from the mortgage and credit crises.  Citigroup's focus on these issues was tacit acknowledgment that there were material concerns of the shareholders and investment community, yet it again failed to truthfully report the tens of billions of "toxic" subprime assets it held.

209.    On July 20, 2007, Williams' Advisors listened to the conference call. They also reviewed the earnings releases and materials downloaded from the Company's website.  At the conference call, Citigroup made the following representations:

> Prince
>
> Now, we are all watching credit. You are watching credit, we're watching credit, we are all watching it very carefully….  I will tell you I feel very good about our processes, about our risk management system and the overall quality of our loan portfolio.
>
> We are building reserves, but net credit losses and loss reserves as a percentage of loans are steady, so we have had some significant credit releases in the past…and right now we are increasing our credit costs as we build reserves, as we stay ahead of trends in the credit environment.  As I said, we are very focused on managing our credit exposures through the cycle.

\*\*\*

<u>Crittenden</u>

In both our first and second mortgage portfolios…the quality of our portfolios continue[s] to be very good.

\*\*\*

Our sub-prime exposure in Markets and banking can be divided into two categories….  The first is secured lending and the second is trading.

With regards to secured lending, we have been actively managing down our exposure for some time.  We had $24 billion in assets at the end of 2006.  It was at $20 billion at the end of the first quarter and $13 billion at the end of the second quarter, while adjusting at the same time collateral and margin requirements.

As for our trading activities….  We monitor every aspect of our sub-prime business daily and we have a rigorous process in place for marking our book using fundamental valuation techniques, market references, and liquidity analysis.

\*\*\*

<u>Crittenden (in response to a question from JP Morgan)</u>

Think about this [$13 billion in the investment bank in sub-prime related assets] as the CDOs, the CLOs, and the secured assets that we hold on our balance sheet.  I think our risk team did a nice job of anticipating that this was going to be a difficult environment, and so it set about in a pretty concentrated effort to reduce our exposure over the last six months.  It was at $26 billion as we ended the year last year; and we stand at about $13 billion today.  Embedded in that $13 billion are our residuals….This is something obviously that we have our eye on, that we're watching very closely and that over time we have brought down to a lower level to reduce our exposure there.

210.    These representations by Citigroup's senior officers portrayed a company

that faced virtually no risk from the subprime mortgage crisis. Instead, Citigroup claimed

to be responsibly managing its risk and reducing its subprime exposure. This would later be revealed to be entirely false.

211.    Williams canceled his sales and selling plan because he relied upon these statements by Citigroup, and believed that the Company was fundamentally strong with good growth prospects in the near term. Had Citigroup been truthful about the extent of its subprime exposure, and the potential risks it faced, Williams would have followed through on his selling plan and liquidated the entire position at approximately $55 per share.

212.    Had Williams sold his remaining 16.6 million shares at $55 per share as he had planned (and he did sell one million shares at this price), he would have realized sales proceeds of approximately $913 million. When he did sell these shares at $3.09 per share, he received approximately $51 million. Thus, his actual damages or the difference are approximately $861 million.

213.    However, Plaintiffs recognize that had Citigroup truthfully disclosed its exposure to subprime assets in May 2007, the price of its shares would have dropped, and they are not entitled to calculate their damages using the artificially inflated price. As a result, Plaintiffs have commissioned a highly reputed damages expert to conduct an event study using widely accepted analytical methods approved by courts in this jurisdiction and many others. Based on the results of that event study, it appears that the true value of the stock on May 17, 2007, *i.e.*, the "fraud-free price" if Citigroup had honestly disclosed its subprime exposure, would have been $51.59. As such, Plaintiffs' recoverable damages are the difference between $55 and the $3.09 per share they ultimately received: $809,950,000.

**5.** **Citigroup's November 4, 2007 Press Release**
**And "Special Call" For Investors**

214.    On October 1, 2007, Citigroup announced that it expected net income to

fall 60% as a result of deterioration in the credit and consumer markets.  Williams and his

Advisors continued to closely watch Citigroup as its stock price declined into the $40s.

215.    On November 4, 2007, Citigroup issued a press release disclosing, for the

first time, its massive subprime exposure.  Citigroup announced that it had $55 billion of

direct subprime exposure, consisting of approximately $11.7 billion of subprime-related

exposure from its structuring business and approximately $43 billion of exposures in

super senior tranches of CDOs that were collateralized by asset-backed securities.

216.    Citigroup also announced that Prince was resigning.

217.    The next day, November 5, 2007, Citigroup held a "special call" for

investors at which senior officers discussed the subprime disclosure that was made.

Williams' Advisors listened to the conference call at which Crittenden made the

following statements:

> As I said on the third quarter earnings call, our exposure to
> these positions had gone from $24 billion at the beginning
> of the year down to $13 billion by the end of the second
> quarter and declined slightly in the third quarter down to a
> total of $11.7 billion.
>
> Our exposure to high end investment grade securities,
> which we believed had very little risk associated with them,
> have historically held up in value and hence they were
> termed super senior and we did not consider this to be a
> significant risk for markdowns.  The $43 billion that we
> disclosed yesterday falls into the super senior category.
>
> ***
>
> Based on our current assumptions, we do expect that we'll
> be maintaining our current dividend level.  We have no

> reason to think that is anything other than absolutely the
> case and we anticipate that we'll return to the range of our
> targeted capital ratios by the end of the second quarter of
> 2008.
>
> ***
>
> The company's cash flow is very strong and to reiterate we
> have no intention to cut the dividend.

218.    These representations, while a huge departure from the false assurances

made up to that point, still made only a partial disclosure of the Company's impaired

assets, its subprime exposure, the extent of further risks and asset write-downs and the

full damage that this exposure could cause to the Company's cash flow and capital.

Citigroup's statements were also misleading because management falsely portrayed the

problem as merely an "accounting" issue that had no impact on its cash flow or future

dividend payments.   Both of those statements were inaccurate and management knew

them to be inaccurate at the time they were made.

219.    Williams had numerous discussions with his Family Advisors and

Financial Advisors about this conference call.   In an email of November 5, 2007, he

inquired "WHEN SHOULD WE SELL or WOULD YOU RECOMMEND BUYING AT

THE LOWER PRICE?"   Plainly, Williams' first thought was to sell the stock in order to

minimize the damage he had already sustained in the months since he first forestalled his

plan to liquidate the position.   After the sudden disclosure, Citigroup's stock price had

fallen into the high $30s, and appeared to be trending lower. The immediate reaction of

his Financial Advisors to Citigroup's disclosures was to "wait and see" how the market

reacted, but also that the news was not as bad as it could have been and that Citigroup

stock would likely recover in the coming months. They also had further discussions about selling the remainder of the stock if it did not react favorably to this news.

220.    However, as Citigroup's situation began to sink in, more questions began to emerge, including whether Citigroup would have to cut its dividend. On December 3, 2007, Williams considered selling out his position while the stock was trading at $33 per share, in order to cut his losses and diversify away from Citigroup. However, his Financial Advisors, having carefully tracked Citigroup's public filings and statements, believed the Company had now come clean, that it was now trading at or near its "bottom" and that it would likely recover. This belief by his Financial Advisors in the long-term prospects for Citigroup was based entirely on the false and misleading information and representations made by the Company and management in its public filings and conference call statements.

221.    Rather than sell out and minimize his damages, Williams relied on Citigroup's false statements that it had fully reported on its write-downs and disclosed their full impact, that the write-downs were an "accounting issue" that did not affect cash flow and that the Company was fundamentally healthy and had reached its "bottom."

### 6.    Citigroup's January 15, 2008 Conference Call and Earnings Release

222.    On January 15, 2008, Citigroup held a conference call to discuss its earnings for the fourth quarter of 2007. Williams' Advisors listened to the conference call during which the following statements were made:

> Pandit
>
> As you know by now, we took over $18 billion in writedowns and losses on our sub-prime exposures. We increased our reserves and had losses in our U.S. consumer business, up over $4 billion. These numbers completely

overwhelm the record performance in many, many of our other large businesses, as well as strong performance in a number of our other businesses.

\*\*\*

The first priority of risk has been to make sure that our legacy portfolio of assets in the sub-prime and mortgage areas are separated and managed to be optimized, and we have done that. We have also made sure that they are well-capitalized.

\*\*\*

<u>Crittenden</u>

First, the $18.1 billion from the writedown and credit costs on sub-prime related direct exposures in our fixed income markets business. Our net super senior ABS CDO direct exposure was $29.3 billion and our gross direct sub-prime exposure related to the structuring and lending business was $8 billion at the end of the quarter.

\*\*\*

In addition, we have quantified what we believe the most significant risk exposures are for the company going forward. This list includes risks such as further decline in sub-prime markets…and a number of other items. The exposures to these areas were stress tested against economic downturns with a variety of severity levels such as multiple recessionary scenarios.

\*\*\*

The total writedowns, including the related higher costs for the fourth quarter were $18.1 billion, including $2.9 billion taken against the lending and structuring position of $11.7 billion and $14.3 billion against the net super senior exposure of $42.9 billion. The gross exposure was $53.4 billion.

223. These statements by Citigroup's senior officers represented a materially incomplete disclosure of its impaired assets, its subprime exposure, the impact of this exposure and the extent of further risks and further asset write-downs. Citigroup's

disclosures were also misleading because management gave the false impression that they had a complete understanding of their exposure, and that it was contained and under control.  In the months to come, it became clear that this was not true and these senior officers knew it was not true at the time these false and misleadingly optimistic statements were made.

224.    After this conference call and based directly on the statements made on the call, Williams and his Advisors believed that while "bad news" continued to hang over Citigroup, there was not much more negative news that could come out about the Company that would result in a further decline in its stock price. They understood that Citigroup remained a fundamentally healthy company, as described by its senior management, with strong revenues from its international activities and other lines of business.

225.    On February 26, 2008, Citigroup filed its Form 10-K annual report for the prior year. This 10-K reflected additional write-downs of subprime assets as well as disclosures about its loan losses and losses associated with its leveraged loans. Citigroup's stock price dropped below $20 per share as the market digested the report.

226.    Williams and his Advisors continued to carefully monitor Citigroup.  The general consensus among them was that Citigroup's stock price had now fallen so far that Williams should hold in the near-term and wait out the crisis rather than sell now and minimize his damages.  This decision reflected the continuing belief, based upon the steady stream of information issued by the Company, that Citigroup's worst news had already been reported and that the Company had a feasible plan to turn itself around.  The Company's purported plan involved restructuring, management changes, capital raising

and divesting itself of non-productive businesses.  Citigroup also planned to focus on growing its core businesses.

227.    Citigroup also repeatedly advised investors that its "Tier 1 Capital ratio," which is an important and closely watched measure of liquidity and strength of balance sheet, was greater than seven and that it would continue paying its dividend.  These two key metrics led investors, including Williams' Advisors constantly reporting to Williams, to believe that Citigroup had sufficient capital and the earnings and cash flow to turn itself around.

228.    On April 8, 2008, Williams' Financial Advisor at Credit Suisse sent him a news article reporting on the Company's sale to a group of private equity funds $12 billion in leveraged loans.  The Advisor reported that sales at "90 cent[s] on the dollar for $12 billion in 'troubled corporate debt' would be good news."  Williams relied on the news of this transaction, which appeared to reflect that Citigroup moved $12 billion in loans off of its balance sheet and that the $43 billion in leveraged loans which it still held were not troubled assets.  When the truth about this transaction was later revealed, it turned out that it was a sham designed to mislead investors about the health and value of these leveraged loans.

229.    On April 18, 2008, Citigroup held its quarterly earnings call.  Williams' Advisors listened as Citigroup's senior management made the following false representations:

Pandit

[W]e are on top of our risks and have focused on prudently managing our legacy risk assets and are reducing risk assets in a way that does not dilute our shareholders. For example, on CDOs, at the year end our net super senior gross

> exposures were about $30 billion.  At the end of the first
> quarter, they were down to under $23 billion with the
> reduction driven mostly by marks.  We have done extensive
> analysis on our assets and believe we have a very good
> understanding of their value and have marked them
> appropriately.  We've also been working hard on reducing
> our risk in these structures.  Some of our riskier positions
> have been hedged by covering the underlying exposure
> with CDS.  On the super senior liquidity puts we believe
> that at these levels the cash on cash returns are very
> attractive and there is significant equity in front of us.

230.    Williams and his Advisors listened carefully and relied on these false representations.  Their reaction to the conference call, as evidenced by email exchanges, was that Citigroup's results were "better than expected" because there were "no real surprises."

231.    In April 2008, Citigroup made additional disclosures concerning the extent and impact of its subprime mortgage CDO exposure.  Those April disclosures, described in more detail herein, made clear that its November 2007 statements were incomplete, false and misleading.

232.    On May 8, 2008, Pandit gave his first annual "Investor Day" presentation about his plans for Citigroup.  Pandit's presentation, a direct communication to Williams and other high net worth shareholders, was entirely positive.  It did not discuss the risk of further deterioration of Citigroup's balance sheet, its assets or its capital position. His plan sought to persuade investors that Citigroup would not only survive the current crisis—which by now would have been a genuine concern for anyone with access to the true condition of the Company—but would emerge a more efficient and stronger company.

233.    Citigroup continued to report additional markdowns of assets while it tried to execute on its plans to raise capital and sell assets.   In the meantime, the entire financial sector was under extreme pressure.   Bear Stearns had been sold in a government-assisted "fire sale" to JP Morgan Chase, and there were rumors that Lehman Brothers was insolvent.  Fannie Mae and Freddie Mac were also in trouble and required government support to stay afloat.

234.    On or about August 20, 2008, as the financial and mortgage crisis worsened, Williams again took steps to sell out his position in order to minimize the damages he had already incurred.  Citigroup was trading at $17.50 at the time.

235.    In September 2008, as he strongly considered a sale, the financial markets were hit by news of Lehman Brothers' bankruptcy. This caused enormous turmoil and uncertainty in the markets.   There were rumors of other iconic financial firms going under, including Merrill Lynch and Morgan Stanley, amid worries about a liquidity crisis. Citigroup, which had access to the Federal Reserve Bank's "discount window," did not see its stock suffer during this time period, as investors believed that it had an emergency source of liquidity.

236.    In fact, in late September 2008, Citigroup appeared to have reached an agreement to acquire Wachovia for $2.2 billion in an attractive deal brokered by the FDIC. Citigroup announced plans to cut its dividend and issue $10 billion of stock to help fund the acquisition. Wall Street viewed this transaction as highly favorable for Citigroup as it would become the world's third-largest bank.

237.    A few days later, Wachovia instead agreed to a $14 billion acquisition by Wells Fargo.   Citigroup attempted to enforce its prior agreement by seeking an

injunction, but the Court ruled against Citigroup. Citigroup's stock price fell from over $20 to $15 per share in the wake of this development.

238.    With two major Wall Street institutions now gone and rumors swirling, Williams was worried that Citigroup might be the next to fail.  On November 11, 2008, he received emails from his Advisors who, after reviewing the Company's publicly released information, concluded that Citigroup was not insolvent and that there was little likelihood that it would fail.  He was extremely concerned and monitored all news on the Company, both personally and through his agents.  He was still looking for the most appropriate time to sell and cut his losses, but chose not to in the belief that the Company's disclosures concerning its financial condition had been truthful, that it was solvent and that it would emerge from the financial crisis in good shape.

239.    On November 17, 2008, Williams and his Advisors reviewed an investor slideshow for a Citigroup "Town Hall Meeting." In the slideshow, Citigroup downplayed the subprime crisis in which it was engulfed, painted an optimistic view of its restructuring and stressed the following themes:

<u>Going Into 2009 Stronger Than 2008</u>

- Underlying business remains strong, and revenues have been stable
- Expenses expected to be down 20% from peak levels
- Headcount expected to be down 20% in the near-term from peak levels
- Significant reduction in risky assets
- Very strong capital position
- Strong competitive position to seize future opportunities

240.    In the slideshow, Citigroup also stressed that its Tier 1 Capital ratio was adequate, that it had lower exposure to U.S. consumer mortgages and had "substantial reductions to its risk exposures."  These statements, and the details and charts backing them in the slideshow, were relied upon by Williams and his Advisors, who believed that

Citigroup was executing on its plans to turn the Company around. Unfortunately, once again Citigroup's representations were false.

241.   This "Town Hall Meeting" did not present the true picture of Citigroup, which was by that time insolvent.  In fact, just days later, the Company required a $300-billion government bailout just days later to prevent its collapse. Thus, Citigroup had hidden the truth about its insolvency, capital needs and impairments.

**7.    After the November 24, 2008 Government Bailout,
        Williams Issued Then Retracted Sell Orders**

242.   On November 24, 2008, it was announced that the federal government had agreed to rescue Citigroup by guaranteeing hundreds of billions of dollars of assets on its balance sheet and injecting capital.  Under the terms of the bailout, Citigroup assumed liability for the first $29 billion in losses, while various government agencies agreed to absorb the losses beyond $29 billion.  The government also agreed to inject $20 billion of cash into Citigroup.  In return, Citigroup gave the government warrants to buy shares in the Company.

243.   This government bailout was shocking to Williams and his Advisors, as they were led to believe from the Company's reports and statements that Citigroup was back on track and executing on its plans for a recovery. As part of the bailout, the shareholders would be diluted by the new issue of warrants to the government and Citigroup agreed not to issue any dividends to its shareholders for the next three years. The loss of dividends eliminated nearly all of Williams' remaining incentive to hold his stock while waiting for a rebound in Citigroup's value.

244.   As the details of the government bailout were revealed, Williams decided that he needed to minimize his losses and sell out his position entirely. His Financial

Advisors were mostly in agreement that he should sell if not all then at least a very large percentage of his Citigroup stock.  One of his Financial Advisors stated that "it was unlikely that C had much intrinsic value." Williams discussed a number of scenarios for selling all of his shares.

245.   On December 2 and 3, 2008, Williams strongly considered selling out his entire position, but again reversed course based on Citigroup's false statements about its financial condition, its "strong capital position," its "reduction of risky assets," and its plans to turn itself around.

### 8.   The Company Reveals The Full Details Of Its Asset Impairments

246.   On January 15, 2009, Citigroup filed a Form 8-K, detailing the terms of the $326 billion federal government bailout. Citigroup itemized the $301 billion in assets that the government would guarantee. These assets included $191.6 billion in consumer loans including $154.1 billion in first and second mortgages, $11.4 billion in Alt-A RMBS and $22.4 billion in unfunded second mortgage commitments. Citigroup also reported net losses for the fourth quarter of 2008 of $8.29 billion, more than twice what analysts had predicted based on the Company's prior public filings and statements. The disclosure of these impairments exposed Citigroup's recovery plans—as presented in May 2008 public statements as well as during the later Town Hall meetings and other formats—to be false and misleading.

247.   Despite these losses, Citigroup remained positive about its current state and plans for recovery.  On January 29, 2009, Pandit issued another investor slideshow for a Citigroup Financial Services Conference which purported to summarize the Company's progress towards increasing liquidity, reducing its riskiest assets, and

demonstrating its "path" to a return to profitability and a secure capital structure. Williams received this slideshow from his Financial Advisors.

248.     Again, Williams and his Advisors relied upon these positive statements by Citigroup during January 2009 about its financial condition, liquidity and capital ratios, as well as its plans to restructure itself. He maintained his position and held even while the stock price fell down to $2 per share.

### 9.     Williams Sells His 16.6 Million Shares Of Citigroup At $3.09 Per Share

249.     In late February 2009, Citigroup's problems persisted and speculation increased in news reports that the Company would file for bankruptcy or be nationalized. Williams' Financial Advisors agreed that he should sell his Citigroup shares, as there was now little likelihood that the stock price, which had fallen to $2 per share, had any potential for recovering. Williams agreed and waited for a slight uptick in Citigroup's stock price to sell.

250.     On March 18, 2009, Williams sold his 16.6 million shares at $3.09. The sales were executed by Plaintiffs in all of the accounts held by AHW, MFS and the GRATs.  He sold all of his holdings of Citigroup stock, and completely exited his positions.

251.     As further evidence of his reliance on Citigroup's misleading statements about its financial condition, Williams purchased additional shares of Citigroup stock at various times.  These additional purchases are separate and apart from the 16.6 million shares he held that are the subject of this action.  These purchases demonstrate his good faith belief in Citigroup's health and future prospects from the information he received from the Company.

252.    In total, Plaintiffs suffered compensatory damages of $861 million as the result of Defendants' wrongful conduct; using a fraud-free May 2007 price of $51.59 per share, the damages are $809,950,000; using an out-of-pocket loss calculation, the damages are $532,897,000.

## VII.    STATUTE OF LIMITATIONS

253.    This action was filed within the relevant statute of limitations as to all Defendants.  The statute did not begin to run until January 2009 at the earliest, when Plaintiffs first learned the full extent of Citigroup's false statements.  The statute was also tolled on December 29, 2010 as to Defendants Citigroup, Prince, Pandit and Crittenden, the date that the first complaint was filed in this action.

## COUNT I
## NEGLIGENT MISREPRESENTATION

254.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

255.    For purposes of this count, Plaintiffs specifically disclaim any allegations of fraud, and only allege negligence.

256.    Defendants had a duty, as a result of a special relationship, *i.e.*, the issuer of shares to public investors, to give accurate information.  Put another way, Citigroup, as a public company represented by its most senior officers making public statements that it knew were subject to multilayered legal and regulatory requirements, owed Plaintiffs a duty of candor.

257.    Defendant Citigroup owed a specific duty directly to Williams, as a result of the relationship it established with him during his years as a substantial

shareholder vis-à-vis the specific information that it provided to Williams and his Advisors through its senior executives.

258.    Defendants, as issuers and senior officers of Citigroup, possessed unique and specialized expertise and information concerning the Company's financial condition and exposure to subprime-related risks.  Such information was available to Plaintiffs only when Defendants chose to reveal it.

259.    Defendants occupied a special position of confidence and trust such that Plaintiffs' reliance on their public statements was justified.   Put another way, Defendants had a duty to speak with care in these circumstances, where the relationship is such that in morals and good conscience Plaintiffs had the right to rely on Defendants for information.

260.    Defendants made multiple false representations that they should have known were incorrect.

261.    Defendants knew that Plaintiffs desired the information supplied in the representations for a serious purpose, *i.e.*, to decide whether to hold or sell their shares in Citigroup.

262.    Plaintiffs intended to rely and act upon the information provided by Defendants.   Plaintiffs reasonably relied on Defendants' representations to their detriment, namely, they decided to hold rather than sell their stake in Citigroup, and as a result of their reliance suffered  $809,950,000 in compensatory damages which includes $532,897,000 in net out-of-pocket damages.

## VIII.   COMMON LAW FRAUD

The Plaintiffs hereby incorporate by reference the paragraphs above as if set forth fully herein, except those which specifically disclaim fraud.

### A.   Citigroup's Scienter

263.   Plaintiffs were personally defrauded by Citigroup, as that cause of action is delineated by the common law of the State of Florida.  As described in greater detail above and incorporated herein by reference, they were the recipients of numerous misrepresentations and omissions of material fact.  Defendants knew that their statements to shareholders concerning Citigroup's subprime exposure were false at the time they were made, *i.e.*, Defendants acted with scienter.  Defendants made these false statements for the purpose of inducing Plaintiffs to hold their Citigroup shares, which they did.

### 1.   FCIC Investigation

264.   In January 2011, the FCIC published its findings ("FCIC Report").  The FCIC analyzed reams of documents and examined numerous witnesses with direct knowledge of the relevant conduct.  It learned that as far back as 2005 and continuing throughout Citigroup's collapse, management's oversight regarding its mortgage business had been "less than satisfactory" and that management had largely ignored "critical risk issues" that presented a "large potential risk to the shareholders of Citigroup."

265.   The FCIC found that Citigroup's senior management, including the individual Defendants in this action, received specific warnings beginning in the summer of 2006 that its shoddy underwriting practices in the subprime arena "exposed

Citi to substantial risk of loss." The individual issuing those warnings, Richard Bowen, was motivated by a desire "to protect Citi and its shareholders." Those warnings went unheeded and shareholders like Williams paid a steep price for Defendants' decision to ignore Mr. Bowen's counsel.

266.   The FCIC also revealed that the OCC in January 2008 issued memorandum regarding Citigroup's subprime valuation and oversight. The OCC memorandum concluded, among other things, the following: "the apparent need to generate quarterly income generated a ramping up in risk exposure"; "[b]usiness units possessed too much power, and independent risk management was marginalized"; "senior management" left risk managers "ill-equipped" and "in a weak position" and they "stood down" when senior business managers supported risk increases"; and the Company allowed its personnel to take on "subprime mortgage exposures without the expertise to avoid massive losses to the institution."

267.   Finally, the FCIC also made public that the Federal Reserve Bank of New York in April 2008 sent to Pandit its annual report of inspection for calendar 2007. That report found, in relevant part, that: the Company had been downgraded from "satisfactory" to "fair" as a result of "weaknesses in risk management and financial condition"; that Citigroup had "serious deficiencies" in "oversight…and internal controls"; that its risk management weakness was most pronounced "in its approach to capturing direct and indirect exposure to subprime mortgage-related CDOs"; "senior management at the firm allowed its drive for additional revenue growth to eclipse proper management of risk"; and "[t]he Board of Directors…does not appear to have posed the proper questions to senior management in the early stages of the

subprime crisis, which otherwise might have caused senior management to report more meaningfully and completely on the potential impact of the firm's risk exposures and future earnings."

2.    **Citigroup's Awareness of its CDO Risk**

268.    Throughout the Relevant Period—both prior to November 2007 when it finally disclosed its CDO liquidity puts, and after—Citigroup was fully aware of the risk posed by its CDO portfolio, yet knowingly failed to disclose this risk to investors such as the Plaintiffs, and knowingly failed to properly value the CDO exposure it did eventually disclose.

269.    For example, starting as early as 2006, Citigroup was unable to sell CDO tranches it originated, and repackaged the unwanted tranches into deceptively titled "high grade" CDOs with names like Diversey Harbor ABS CDO, Ridgeway Court Funding I, and 888 Tactical Fund.

270.    In addition, 65% of Citi's hedging activities for CDO-related transactions over a four-year period to June 2007 were in the last four months starting in February 2007.  This sudden jump clearly demonstrates that Citigroup was well aware of the risk posed by the CDOs on its balance sheet.

271.    In addition, as evidenced by the SEC's complaint and consent entered into with Citigroup, Citi was fully aware of its CDO exposure via liquidity puts starting as early as 2004 yet failed to inform investors until November 2007.  Throughout 2007, Citigroup had several high-level meetings to discuss the puts, and purposefully chose to deceive investors and keep the exposure a secret.

272.   In addition, in March 2007, Citigroup's Quantitative Risk Strategy and Analysis Group issued a secret internal report that clearly demonstrated Citi's understanding that even its super-senior CDO tranches were already impaired and were at grave risk of losses, yet Citi failed to mark them down in conformity with its internal understanding.

273.   Even after November 2007, Citigroup knowingly failed to report accurate values for its retained CDOs, instead using valuation models and techniques that it later admitted were inappropriate.   In addition, while Citigroup did finally disclose $43 billion of subprime CDO exposure previously hidden from investors, it still knowingly failed to disclose a further $10.5 billion of super senior CDOs that were supposedly hedged, but were in fact not, because Citi knew that the monoline counterparties could never make good on the insurance supposedly provided.

**3.**   **Repo 105**

274.   In addition, Citigroup also engaged in misleading "Repo 105" transactions.   As first reported by the Bankruptcy Examiner for Lehman Brothers, Repo 105 transactions were repurchase transactions designed to mislead investors by moving assets off the balance sheet to make leverage ratios appear lower, and a bank like Citigroup appear healthier.

275.   In a letter to the SEC dated April 13, 2010, responding to an inquiry, Citigroup admitted to temporarily transferring billions of dollars off its balance sheet at quarter end, reducing the reported assets on its balance sheet and its Tier 1 leverage and capital ratios.   Citigroup further admitted that most of these temporary quarter-end transactions (as much as $9.2 billion in one quarter) were improperly classified as sales.

276.   Citigroup even admitted that its purpose for these transactions was to "manage its balance sheet."

277.   Citigroup's repeated use of quarter-end Repo 105 transactions are further evidence that Citigroup knew it was manipulating its balance sheet and purposefully trying to make its financial condition appear healthier than it really was.

## B.   Individual Defendants' Scienter

278.   Defendants Prince, Pandit, Crittenden, Druskin, Maheras, Klein and Bushnell, corporate insiders all, were involved in the preparation of Citigroup's SEC filings during the relevant time period or were otherwise deeply involved in Citigroup's day-to-day activities.

279.   For example, Defendant Pandit signed and certified the accuracy of Citigroup's financial statements on Forms 10-Q and 10-K for the full year 2007, the first three quarters of 2008. Defendant Prince signed and certified the accuracy of Citigroup's financial statements on Forms 10-Q and 10-K for the first three quarters and full year 2004, the first three quarters and full year 2005, the first three quarters and full year 2006, and the first three quarters of 2007. Defendant Crittenden signed and certified the accuracy of Citigroup's financial statements on Forms 10-Q and 10-K for the first three quarters and full year 2007 and the first quarter of 2008.  And Defendants Bushnell, Klein, Druskin and Maheras, participated in the drafting, preparation and/or approval of

280.   Defendant Rubin (like Defendant Prince) explicitly directed Citigroup to expand its CDO operations, while recognizing the risks these instruments presented:

> A look at some of Citigroup's recent endeavors offers a
> window onto Mr. Rubin's role at the bank. Early in 2005,

Citigroup's board asked the C.E.O., Mr. Prince, and several top lieutenants to develop a growth strategy for its fixed-income business. Mr. Rubin peppered colleagues with questions as they formulated the plan, according to current and former Citigroup employees. With Citigroup falling behind Wall Street rivals like Morgan Stanley and Goldman Sachs, Mr. Rubin pushed for the bank to increase its activity in high-growth areas like structured credit. He also encouraged Mr. Prince to raise the bank's tolerance for risk, provided it also upgraded oversight. Then, according to current and former employees, he helped sell the proposal to his fellow directors.

(New York Times, *Where Was the Wise Man*, April 27, 2008)

281.   In addition, bankers inside the company reported that Rubin was:

"like the Wizard of Oz behind Citigroup, he is the guy pulling on all the strings," said one Citigroup banker who was not authorized to speak publicly about the situation. "He certainly was the guy deferred to on key strategic decisions and certain key business decisions vis-a-vis risk." "When you have responsibility with no accountability, that is a very dangerous thing on Wall Street," this banker added... (*Id.*)

## C.   Financial Incentives to Perpetuate Fraud

282.   Citigroup's senior managers, who had knowledge of the Company's true financial condition and exposure but withheld this information from investors, had substantial personal financial incentives to perpetuate this fraud.  Namely, their personal compensation and net worth largely depended on maintaining the highest possible value for Citigroup's stock price.

283.    As part of the annual compensation, Citigroup paid its senior managers multi-million dollar cash bonuses which were based, in large part, on the Company's financial performance and its stock price.  Citigroup also paid its senior managers multi-million dollar stock awards and stock options.  Together, these cash bonuses, stock

awards and stock options represented over 90% of the compensation paid by Citigroup to its senior managers, and the worth of this compensation was all tied to the value of the stock price.

284.   In addition, during the relevant period while the fraud was ongoing, Citigroup's senior officers also sold off hundreds of thousands of shares of their personal holdings of Citigroup stock, which yielded proceeds of tens of millions of dollars to their personal net worth.  These sales protected their personal wealth while Citigroup's stock collapsed in value, and the Company encouraged its shareholders put their faith in its turnaround plans.  Had the extent of the Company's exposure to "toxic" subprime assets been truthfully disclosed during the spring of 2007, their shares would have netter far lower profits than they did.

285.   Specifically, during the Relevant Period, Defendant Prince sold approximately 508,306 shares of Citigroup common stock for proceeds of approximately $25,716,471.11, Defendant Druskin sold approximately 618,932 shares of Citigroup common stock for proceeds of approximately $31,988,422.42, Defendant Maheras sold approximately 23,946 shares of Citigroup common stock on July 13, 2007 for proceeds of approximately $1,266,257.76, Defendant Klein sold approximately 19,282 shares of Citigroup common stock on July 17, 2007 for proceeds of approximately $1,006,327.58, and Defendant Bushnell sold approximately 244,843 shares of Citigroup common stock for proceeds of approximately $12,345,172.68

286.   Beyond the personal financial incentives, the Company itself had an additional, highly compelling financial motive to keep its stock price as high as possible. For many years, since the Sandy Weill era, Citigroup had done everything in its power to

execute on its business strategy and to create a brand as a "one-stop" financial services "supermarket."  This strategy was fueled by a pattern of acquisitions that were the lifeblood of Citigroup's growth.  When the Company's balance sheet began to weaken and its growth slowed, the Company needed to create the appearance of operating leverage to fund and support its business model. Citigroup's management was also at risk for replacement due to failures to execute on its business strategies. Thus, Citigroup and its senior officers were motivated to maintain a strong balance sheet and withhold negative disclosures about its eroding assets or business while the mortgage crisis unfolded.

287.    As the mortgage crisis engulfed the financial sector, Citigroup's motive to mislead investors remained as strong.  As more and more of its assets became impaired, Citigroup needed to raise capital for liquidity purposes to calm investors and stave off a collapse. Citigroup's management needed to present a healthy financial condition and picture to attract capital infusions and raise cash, such as the infusions it received from foreign sovereign wealth funds in November 2008.  Citigroup's management also needed to demonstrate visible progress on its restructuring plans.   This further motivated Citigroup to mislead shareholders, including Williams.

288.    In sum, Defendants had ample corporate and personal financial motives to carry out this fraud.

## COUNT II
## COMMON LAW FRAUD

289.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

290.     Plaintiffs were personally defrauded by Citigroup, as that cause of action is delineated by the common law in the State of Florida.

291.     Plaintiffs were the recipients of multiple misrepresentations and omissions of material fact.

292.     Defendants knew their statements to Plaintiffs concerning Citigroup's subprime exposure were false at the time they were made.

293.     The individual Defendants, as senior officers of Citigroup, were uniquely knowledgeable about the Company's true financial condition and the extent of its subprime exposure.  With intimate knowledge of the Company's assets, in particular the amount and value of the "toxic" subprime holdings, the individual Defendants had a full understanding of the truth and yet disseminated falsehoods to create a misleading and "rosy" picture of the Company's current state and future prospects.

294.     Defendants made these false statements for the purpose of inducing Plaintiffs to hold their Citigroup shares, which they in fact did.

295.     Plaintiffs' specific reliance on Defendants' misrepresentations and omissions was reasonable in that Citigroup is a public company under strict legal and regulatory obligations to be truthful in its public pronouncements.

296.     And as a direct result of Defendants' fraudulent statements and Plaintiffs' reliance thereon, Plaintiffs suffered approximately $809,950,000 in compensatory damages including $532,897,000 in net out-of-pocket damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

A.      Awarding   $809,950,000   in   compensatory   damages   including
$532,897,000 in net out-of-pocket damages against Defendants in favor of Plaintiffs,
and for additional damages sustained as a result of Defendants' wrongdoing;

B.      Awarding prejudgment interest;

C.      Awarding punitive damages as appropriate;

D.      Awarding Plaintiffs their costs and disbursements of this suit, including
reasonable attorneys' fees, accountants' fees, and experts' fees; and

E.      Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand trial by a jury on all of the triable issues of this complaint.

Dated: July 1, 2011

**ZAMANSKY & ASSOCIATES LLC**

By:            /s/

Jacob H. Zamansky (JZ-1999)
jake@zamansky.com
Edward H. Glenn, Jr. (EG-0042)
Kevin D. Galbraith (KG-7512)
50 Broadway, 32nd Floor
New York, New York 10004
Telephone:  (212) 742-1414
Facsimile:   (212) 742-1177

*Counsel for Plaintiffs*