UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AHW INVESTMENT PARTNERSHIP, MFS,
INC., and ANGELA H. WILLIAMS as
TRUSTEE of the ANGELA H. WILLIAMS
GRANTOR RETAINED ANNUITY TRUST
UAD MARCH 24, 2006, the ANGELA
WILLIAMS GRANTOR RETAINED
ANNUITY TRUST UAD April 17, 2006, the
ANGELA WILLIAMS GRANTOR RETAINED
ANNUITY TRUST UAD MAY 9, 2006, the
ANGELA WILLIAMS GRANTOR RETAINED
ANNUITY TRUST UAD NOVEMBER 1, 2007,
the ANGELA WILLIAMS GRANTOR
RETAINED ANNUITY TRUST UAD MAY 1,
2008, the ANGELA WILLIAMS GRANTOR
RETAINED ANNUITY TRUST UAD JULY 1,
2008, and the ANGELA WILLIAMS
GRANTOR RETAINED ANNUITY TRUST
UAD NOVEMBER 21, 2008,

                                    Plaintiffs,

            -against-

CITIGROUP INC., CHARLES PRINCE,
VIKRAM PANDIT, ROBERT RUBIN, ROBERT
DRUSKIN, THOMAS G. MAHERAS,
MICHAEL STUART KLEIN, DAVID C.
BUSHNELL and GARY CRITTENDEN,

                                    Defendants.

---

09 MD 2070 (SHS)
This document relates to:
10 Civ. 9646 (SHS)

OPINION & ORDER

**TABLE OF CONTENTS**

I.   BACKGROUND ................................................................... 3

II.  DISCUSSION ..................................................................... 5

     A. The Claims are Direct, not Derivative.                          5

     B. New York Substantive Law Governs the Fraud and
        Negligent Misrepresentation Claims.                             9

        1.  New York and Florida Law Conflict ...................................... 10

            a.  Negligent Misrepresentation                            10

            b.  Common Law Fraud                                       10

        2.  New York has a Greater Interest in the Litigation than
            Florida. ....................................................................... 14

     C. New York Law Requires Dismissal of the Action.                18

        1.  Plaintiffs' Negligent Misrepresentation Claim Fails
            Because they have Not Alleged a "Special
            Relationship." ........................................................... 18

        2.  Plaintiffs' Common Law Fraud Claim Fails Because
            they have Not Alleged Cognizable Damages
            Proximately Caused by the Fraud. ......................................... 19

III. CONCLUSION ................................................................... 21

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs raise common law claims of negligent misrepresentation and fraud that take the form of what are referred to as "holder" claims: i.e., they allege that they would have sold their Citigroup stock but instead held it to their detriment in reliance on defendants' misleading statements. Specifically, plaintiffs allege that they planned to sell 16.6 million shares of Citigroup stock in May 2007. However, believing defendants' misrepresentations that minimized Citigroup's exposure to its risk from holding residential mortgage-backed securities, they instead held the stock

until March 2009 as its price fell by 95%. Defendants have moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

Defendants principally assert that plaintiffs cannot state a valid claim based on an injury that derives from a contemplated sale in hypothetical market conditions. The motion presents a choice between New York law—which largely prohibits fraud claims by holders of publicly traded securities alleging such an injury—and Florida law—which likely permits those claims. Defendants contend, first, that New York law applies to plaintiffs' claims and, second, that New York law bars recovery here because the alleged damages are speculative and not proximately caused by the misrepresentations. *See Starr Found. v. Am. Int'l Grp., Inc.*, 76 A.D.3d 25 (1st Dep't 2010). Plaintiffs respond that Florida law applies and permits their claims, and, alternatively, that their claims are actionable pursuant to New York law because they have pled the contemplated sale with sufficient specificity.

Because New York state has the greater interest in applying its law to govern suits regarding misrepresentations made in New York about stock in a New York-based corporation that is traded on a New York exchange, New York law applies to these claims. Applying New York law, the Court finds that plaintiffs have failed to allege cognizable damages proximately caused by the alleged misrepresentations, and thus dismisses the action.

## I. BACKGROUND

According to the Amended Complaint (the "Complaint")),[2] the Citigroup shares at issue trace to non-party Arthur Williams and the 1998

---

[1]    The alleged misstatements largely match those that the Court previously found were a valid basis for federal statutory securities fraud claims in two related class actions. *See In re Citigroup Inc. Bond Litig.*, No. 08 Civ. 9522 (SHS), 2013 WL 4427195 (S.D.N.Y. Aug. 20, 2013); *In re Citigroup Inc. Sec. Litig.*, Nos. 09 MD 2070 (SHS), 07 Civ. 9901 (SHS), 2013 WL 3942951 (S.D.N.Y. Aug. 1, 2013); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010).

[2]    In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the

(*footnote continued on next page*)

merger between Citicorp and Travelers Group that formed Citigroup. (Compl. ¶¶ 1-3.) Williams "acquired 17.6 million shares of Citigroup common stock valued at approximately $35 per share" as a result of that merger. (*Id.* ¶ 3.) By 2007, Williams and his wife Angela had transferred these shares to the plaintiff entities—a partnership, a corporation and a series of trusts (*id.*)—all of which the couple controlled (*id.* ¶¶ 1, 14-16, 169).

In May 2007, Williams developed a plan "to sell out his entire Citigroup position." (*Id.* ¶ 5.) In forming this plan, Williams and his financial advisors thoroughly "combed through Citigroup's filings and statements" (*id.* ¶ 170), examining information that included "conference calls, investor slideshows, earnings releases, public filings and statements from senior officers" (*id.* ¶ 169). Williams investigated "whether [Citigroup] had meaningful exposure to the subprime mortgage assets that were beginning to drag down other major players in the financial services sector." (*Id.* ¶ 170.) Although Citigroup had substantial exposure to risky subprime assets throughout 2007, it failed to disclose that exposure until November 2007. (*See, e.g., id.* ¶¶ 64-74, 103-09.) Although Williams thus believed that Citigroup's balance sheet was healthy, he nonetheless sold 1 million shares on May 17, 2007 at $55 per share. (*Id.* ¶ 170.) However, "[t]rusting that [Citigroup]'s public pronouncements were forthright and that it had no exposure to those 'toxic' assets, Williams reversed course [on his plan to fully liquidate] and decided to hold the remainder of his shares." (*Id.* ¶ 170.)

Williams "continually" reconsidered selling the remaining 16.6 million shares "[o]ver the next seventeen months," only to be deceived into holding them each time. (*Id.* ¶ 177.) He reconsidered the sale in July 2007, for example, but decided against it after listening to an earnings call and reviewing "earnings releases and materials downloaded from [Citigroup]'s website." (*Id.* ¶ 209.) Similarly, in January 2008, Williams decided not to sell in reliance on an earnings call in which executives explained further write-downs, but assured investors that "they had a

---

plaintiffs' favor. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011); *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 376 (S.D.N.Y. 2011).

complete understanding of their exposure, and that it was contained and under control." (*Id.* ¶ 223.) The price of Citigroup stock steadily fell as market conditions worsened and news of its exposure to toxic assets, with associated accounting and liquidity issues, trickled out. (*See, e.g., id.* ¶ 235 (discussing the effect of "enormous turmoil and uncertainty in the markets".) "It was not until the end of 2008 that Citigroup's full exposure during the subprime crisis, and the consequences [of] its exposure, were revealed." (*Id.* ¶ 115.) Williams finally sold the 16.6 million shares at issue for $3.09 per share on March 18, 2009. (*Id.* ¶ 250.)

Although plaintiffs cite multiple instances of detrimental reliance on defendants' misstatements after May 2007, they allege that their losses stem in full from their having *not* sold 16.6 million shares at some time after the executed sale of 1 million shares on May 17, 2007. But plaintiffs claim as damages the price they would have received for all 16.6 million shares on May 17, 2007—the estimated "fraud-free price" of $51.59—less the $3.09 per share they actually received in 2009. (*Id.* ¶ 171-72.) Alternatively, they claim out-of-pocket damages based on the $35 value of Citigroup shares at the time of the Travelers merger, not on the estimated May 2007 price. (*Id.* ¶ 173.)

## II. DISCUSSION

The Court first analyzes whether plaintiffs' claims are actually shareholder derivative claims that they lack shareholder standing to assert on behalf of the corporation. The Court finds the claims are direct and determines that New York law applies to both claims. Finally, the Court finds that New York law requires dismissal of the claims as a matter of law.

### A. The Claims are Direct, not Derivative.

The Court rejects defendants' contention that these claims are in reality derivative claims brought on behalf of Citigroup.[3] The parties agree

---

[3]     If plaintiffs lack shareholder standing to assert the claims because they are derivative, then the Court is arguably without jurisdiction to hear the case. The U.S. Supreme Court views the shareholder standing rule—which "generally prohibits

(*footnote continued on next page*)

that Delaware law determines whether claims against Citigroup are direct or derivative because Citigroup is incorporated in Delaware. *See Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249, 255 (S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir. 2011). Two questions comprise the applicable test in Delaware courts: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

Conveniently ignoring the second question entirely, defendants contend that because all shareholders suffered when the price of Citigroup stock fell subsequent to the contemplated May 2007 sale, any claim seeking redress for that loss in value is necessarily derivative. This reasoning invokes the bright-line test that *Tooley* "expressly disapprove[d]," *id.* at 1039: that "a suit must be maintained derivatively if the injury falls equally upon all stockholders," *id.* at 1037 (abrogating *Bokat v. Getty Oil Co.*, 262 A.2d 246 (Del. 1970)). That bright line and defendants' argument mistake a necessary condition for a sufficient one. "[A] direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim." *Id.* These are two such direct claims.

Defendants' contentions to the contrary ignore *Tooley*'s instruction that "a court should look to the nature of the wrong and to whom the relief should go." *Id.* at 1039. In sum, the relevant considerations for the *Tooley* test are the following: According to plaintiffs' allegations, "the duty breached was owed to" them and other investors directly, not to Citigroup

---

shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action"—as relevant to "the prudential requirements of the standing doctrine." *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The rule is "[r]elated" to the principle that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (citation omitted). Accordingly, the Court first addresses whether the prudential standing doctrine removes these claims from its jurisdiction.

and indirectly to shareholders. *See id.*[4] Plaintiffs have also alleged injuries resulting from their unique reliance that is "independent of any alleged injury to" Citigroup. *See id.* Even if Citigroup was also injured, plaintiffs' injuries are not dependant on Citigroup's injury merely because the same misconduct might have harmed Citigroup. *See, e.g., Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996) ("Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim."), *cited with approval by Tooley*, 845 A.2d at 1038. Indeed, plaintiffs "can prevail without showing an injury to" Citigroup because the nature of the allegation is that the misstatements and omissions concealed damage to Citigroup's assets that had already been done. *See Tooley*, 845 A.2d at 1039; *cf. Draper Fisher Jurvetson Mgmt. Co. v. I–Enter. Co.*, No. C 03-1561 MMC, 2004 WL 2944055, at *7 (N.D. Cal. Dec. 15, 2004) (finding breach of duty to report "would injure only the partners, and not the partnership itself, as the financial condition of the partnership exists regardless of whether it is reported to the limited partners"). Finally, defendants do not even contest that any remedy will go directly to plaintiffs, not to Citigroup. To put it simply, plaintiffs, not Citigroup, are the victims of Citigroup and the officer defendants' alleged deception, and therefore plaintiffs are the ones with standing to sue.

The Court recognizes a tension in Delaware law between two lines of cases applying the *Tooley* test to holder claims—one line finds that misrepresentations and omissions generally give rise to direct claims and the other line finds that injuries that result from the diminution of stock value are generally derivative. *Compare Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. Civ.A.762-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) ("Generally, non-disclosure claims are direct claims."), *with Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) ("Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with

---

[4]    Defendants' reliance on *Stephenson v. PricewaterhouseCoopers, LLP*, a summary order, is misplaced. *See* 482 F. App'x 618, 621 (2d Cir. 2012). There, the defendant had audited a limited partnership in which the plaintiff had invested; the court found a holder claim derivative because the plaintiff had not alleged "that [the defendant] owed him a duty as a potential investor." *Id.* Plaintiffs here are not suing Citigroup's auditors.

their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."); *see generally Poptech, L.P. v. Stewardship Inv. Advisors, LLC*, 849 F. Supp. 2d 249, 262-24 (D. Conn. 2012) (recognizing similar tension).

Following the latter line, the U.S. Court of Appeals for the Fifth Circuit has held that holder claims such as plaintiffs' claims are necessarily derivative because the alleged misstatements "only injured [the plaintiffs] indirectly as a result of their ownership of" stock. *See Smith v. Waste Mgmt., Inc.*, 407 F.3d 381, 384 (5th Cir. 2005). This Court respectfully disagrees. *Accord In re Harbinger Capital Partners Funds Investor Litig.*, No. 12 Civ. 1244 (AJN), 2013 WL 5441754, at *9-10 (S.D.N.Y. Sept. 30, 2013) (finding that plaintiffs' negligent misrepresentation and fraud claims based on defendant funds' alleged misrepresentations to investors were direct). The direct claims of the plaintiffs in *Tooley* itself concerned an injury suffered "as a result of their ownership of" stock. They had asserted that the corporate board's delay in closing a transaction harmed them insofar as their stock was worth less based on the time-value of the set amount of money they would be paid at closing. *See* 845 A.2d at 1034. Their injury was the impairment in the value of their stock, but they were injured because the board allegedly violated a contractual duty owed to those stockholders, *id.*, not "*solely* because they are stockholders," *cf. Feldman*, 951 A.2d at 733 (emphasis added).[5]

In both Delaware cases on which defendants rely, the derivative claims were premised on an insider's breach of a duty owed to the

---

[5]    Defendants contend that *Tooley* presents the only circumstance that justifies that court's rejection of the bright-line rule on which defendants rely. They argue that *Tooley* was unique because claims for the lost time-value of an asset do not allege depreciation of that asset. (Reply Mem. at 14 n.32.) In other words, they contend that the *Tooley* plaintiffs' injury, and thus claim, was unique because their alleged loss did not take the form of a drop in stock price. But that distinction elevates form over substance. There, as here, the plaintiffs alleged damage tied to lost value of their shares resulting from defendants' breach of a duty owed to plaintiffs, not to the corporation. That the lost value took the form of the loss of the ability to use the value of the stock during a certain period of time rather than a price with a falling numeric value is a distinction without an economic difference for these purposes.

corporation. In *Feldman*, the allegations concerned board members' breaches of their fiduciary duties that diluted the plaintiff's ownership stake. *See id.* at 732. In *Manzo v. Rite Aid Corp.*, meanwhile, the Court of the Chancery dismissed the *fraud* claims because plaintiff had not pled reliance or cognizable damages, not because they were derivative. *See* No. Civ.A.18451-NC, 2002 WL 31926606, at *4-5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003). By contrast, the *Manzo* court dismissed a breach of fiduciary duty claim as derivative only after noting the possibility "that intentional misrepresentations to 'holders' of stock . . . could give rise to either a direct or a derivative claim." *Id.* at *5 (citing *Malone v. Brincat*, 722 A.2d 5, 16-17 (Del. 1998)). Unlike the fiduciary duties at issue there, the duty here is owed to members of the investing public.

## B. New York Substantive Law Governs the Fraud and Negligent Misrepresentation Claims.

"[F]ederal courts must follow conflict of laws rules prevailing in the states in which they sit." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941). Pursuant to New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993). In the absence of a conflict, courts apply the forum state's law. But if the states' laws governing tort claims conflict,

> New York applies the law of the state with the most significant interest in the litigation. In weighing interests, New York distinguishes between "conduct regulating" and "loss allocating" rules. If conduct regulating rules are in conflict, New York law usually applies the law of the place of the tort ("*lex loci delicti*"). However, if loss allocating rules conflict, the choice of law analysis is governed by the so-called *Neumeier* rules.

*Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (citations omitted). Here, the states' laws conflict on conduct-regulating rules for both claims, and New York's greater interest in regulating the conduct at issue entails the application of its law.

### 1. *New York and Florida Law Conflict.*

#### a. *Negligent Misrepresentation*

The parties agree that the elements of negligent misrepresentation pursuant to New York and Florida law differ materially. New York requires a "special relationship" between the parties; Florida does not. *Compare Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (first element of "claim for negligent misrepresentation requires the plaintiff to demonstrate [] the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff"), *with Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 337 (Fla. 1997) (adopting Restatement (Second) of Torts § 552 (1977), with no such requirement). Thus, the Court must undertake an interest analysis to determine which state, New York or Florida, has the greater interest in the litigation. The answer to that inquiry will in turn determine whether plaintiffs must plead the existence of a "special relationship."

#### b. *Common Law Fraud*

The parties agree that the basic elements of common law fraud in New York and Florida are substantially equivalent.[6] They further agree that the states differ in their treatment of holder claims, but disagree about the nature and significance of that difference. Neither state's law regarding holder claims has been conclusively determined by the state's highest court. Thus, the Court "must carefully predict how the state's highest court would resolve" these issues. *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (quoting *The Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)).

---

[6]   New York's elements include the following: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996)). Florida has substantially the same elements with slightly different wording and numbering. *See Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984).

i.   Florida Holder-Claim Law

There are few clues in Florida law to its treatment of holder claims, but the weight of authority supports the conclusion that Florida would permit holder claims with heightened pleading standards. There is one case in which a Florida intermediate appellate court reversed the grant of summary judgment to a defendant that had allegedly dissuaded a plaintiff from selling stock. *See Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. Dist. Ct. App. 2001). Indeed, the plaintiff in *Ward* had actually placed an order to sell her stock but was persuaded to abandon it in a telephone call that a representative of the bank initiated to the stockholder. *Id.* at 1145. She had "properly alleged common law fraud" despite that she had not purchased or sold shares in reliance on the misstatements—a fact that apparently garnered no attention. *Id.* at 1146.

Federal courts have predicted that Florida would permit holder claims, subject to heightened pleading requirements for the reliance element. *See, e.g.*, *Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390, 411 (S.D.N.Y. 2006). More specifically, those courts have generally followed the lead of *Rogers v. Cisco Systems, Inc.*, 268 F. Supp. 2d 1305 (N.D. Fla. 2003). There, a federal district court in Florida predicted that Florida courts would follow the Second Restatement of Torts and recognize holder claims, *id.* at 1313, and that Florida would adopt California's heightened pleading standards for reliance, *id.* at 1314 (citing *Small v. Fritz Cos., Inc.*, 65 P.3d 1255 (Cal. 2003)). California law requires that plaintiffs allege specific reliance as follows:

> that if the plaintiff had read a truthful account of the corporation's financial status, the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied upon the misrepresentations.

*Small*, 65 P.3d at 1265. Aside from the heightened pleading requirements, neither *Small* nor *Rogers* imposed any other limits on the viability of holder claims. This Court, like the *Rogers* court, predicts that Florida would adopt California's approach to recognizing holder claims as explained in *Small*.

ii.   New York Holder-Claim Law

New York courts have not explicitly defined distinct pleading requirements applicable to holder claims, but the Appellate Division, First Department, has significantly narrowed the scope of cognizable damages for holder claims in *Starr Foundation v. American International Group, Inc.*, 76 A.D.3d 25, 28 (1st Dep't 2010). *Accord Mantana v. Merkin*, No. 13 Civ. 1534 (PAE), 2013 WL 3940825, at *11 (S.D.N.Y. July 30, 2013) ("The Appellate Division, First Department, has recently held that New York law does not recognize a holder claim seeking to recover lost profits."). As with plaintiffs here, the plaintiff in *Starr* sought to recover the price it would have received if it had sold shares of AIG during a specified time frame had AIG not misrepresented and concealed certain facts. *Id.* at 27. The Appellate Division rejected this claim for three distinct but related reasons. First and foremost, the most basic terms of New York's out-of-pocket damages rule limit a fraud plaintiff to recovering its actual losses, not "profits which would have been realized in the absence of fraud." *Id.*

Second, the court characterized "the value [the plaintiff] might have realized from selling its shares during a period when it chose to hold, under hypothetical market conditions" in which the concealed facts were widely known, as the "undeterminable and speculative" proceeds of "an alternative contractual bargain." *Id.* at 28 (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 422 (1996)).

Third, the court characterized the claimed damages—the decline in the stock price after revelation of the truth in worse market conditions—as a mere "paper 'loss'" that the alleged misrepresentations did not proximately cause. *Id.* at 29. The decline "was caused by the underlying business decision of AIG's management to build up the [toxic assets] on which the losses reported in early 2008 were sustained, not by the earlier alleged misrepresentations forming the basis of the [plaintiff's] complaint." *Id.* at 29. "In holding its stock, the [plaintiff] did not lose or give up any value; rather, it remained in possession of the true value of the stock, whatever that value may have been at any given time." *Id.* at 28. The majority also explicitly rejected the dissent's attempt to parse the price drop into distinct categories, with part of the drop having a closer causal connection to the misstatements. Whether the reduced price reflected the

12

market's concerns about the revealed truth, about the fact that management concealed information from the public, or about changed market conditions unrelated to the misstatements, the causal chain could not be credited as a matter of law. *Id.* at 30-31.

As noted above, the decision in *Starr* was rendered by an intermediate appellate court. A federal court will only decline to follow such an intermediate appellate court decision if it "find[s] persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (quoting *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 221 (2d Cir. 2003)). The degree to which this Court is bound to follow *Starr* depends on whether New York's intermediate appellate courts are in conflict as to the viability of holder claims regarding publicly traded corporations, and if not, whether "persuasive evidence" suggests that the Court of Appeals would reject *Starr*.

On the first question, plaintiffs point to another First Department decision: *Continental Insurance Co. v. Mercadante*, 222 A.D. 181 (1st Dep't 1927). But *Starr* succinctly distinguished *Mercadante* and even cast doubt on that 83-year-old decision's "continuing vitality." *See* 76 A.D.3d at 33.

On the second question, plaintiffs point to the decisions of courts in other states that permit certain holder claims as evidence that the New York Court of Appeals would reject *Starr*. But the fact that some courts in other states may not follow *Starr* is no reason to disregard a recent First Department decision quite squarely addressing the viability of claims by holders of publicly traded securities.[7]

---

[7]      It is true that the New York Court of Appeals has recognized that common law fraud claims extend to plaintiffs who were fraudulently induced to refrain from acting. *See, e.g., Hadden v. Consol. Edison Co.*, 45 N.Y.2d 466, 470 (1978) (in the context of an employment dispute); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406 (1958) (sustaining fraud allegation that "plaintiff refrained from securing commitments for future supplies from others" in reliance on defendant's misrepresentation that it had available and uncommitted supplies). *Starr*, however, addressed the specific issue of the viability of claims by holders of publicly traded

(*footnote continued on next page*)

In sum, New York's appellate courts are the best predictors of how the New York Court of Appeals would decide such a contentious issue. Accordingly, the Court adopts *Starr* as the law governing holder claims in New York. New York law thus diverges from Florida law on whether a holder's losses on a publicly traded security are legally cognizable.

### 2. *New York has a Greater Interest in the Litigation than Florida.*

Having found that the law of New York conflicts with that of Florida, the Court must now determine "which of two competing jurisdictions has the greater interest in having its law applied in the litigation. The greater interest is determined by an evaluation of the facts or contacts which relate to the purpose of the particular law in conflict." *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994) (citations, quotation marks, and alterations omitted). "[T]he significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985). The type of law in conflict determines which contacts are most important; the place of the tort is most important for conduct-regulating rules, and the parties' domiciles take priority for loss-allocating rules. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993).

Plaintiffs contend that the only relevant difference is a loss-allocating rule governing the calculation of damages. Defendants contend that *Starr* sets forth conduct-regulating rules because it concerns not the calculation of damages but whether a holder's losses are legally cognizable at all. The parties also dispute the significance of New York's and Florida's contacts with this case; plaintiffs emphasize that the place of the loss determines the location of a tort, and defendants emphasize that the conduct to be regulated occurred in New York.

---

securities and does not conflict with those decisions. Plaintiffs' reliance on *AUSA Life Insurance Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000), is misplaced for the same reason. More importantly, *AUSA Life*'s prediction of New York proximate causation law relied heavily on *Mercadante* and lacked the benefit of *Starr* having been decided. *See id.* at 212-13, 220.

### i.   Conduct-Regulating or Loss-Allocating Rules

As in *Padula*, the Court finds that the rules at issue here are "are primarily conduct-regulating rules." 84 N.Y.2d at 523. Such rules "govern[] conduct to prevent injuries from occurring." *Id.* at 522. They aim to deter certain actions or shield other actions from deterrence. "Loss allocating rules, on the other hand, are those which prohibit, assign, or limit liability after the tort occurs . . . ." *Id.* The primary purpose of the rule articulated in *Starr* is to encourage the optimal functioning of the securities markets. Rather than accepting that a tort had been properly alleged and constraining or shifting liability as a policy matter, the *Starr* court found that plaintiffs could not prove fraud in the first place. Thus, the rules established in *Starr* are different in kind from the "charitable immunity statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution rules" that exemplify loss-allocating rules. *See Padula*, 84 N.Y.2d at 522 (citations omitted). Further, neither side disputes that the elements of negligent misrepresentation constitute conduct-regulating rules. *See Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortg. Corp.*, 265 F. Supp. 2d 366, 378 (S.D.N.Y. 2003) (both fraud and negligent misrepresentation rules are conduct regulating), *aff'd*, 96 F. App'x 750 (2d Cir. 2004).Thus, the Court must determine which state has the greater interest in applying its conduct-regulating rules to the allegations here, focusing primarily on the location of the conduct to be regulated.

### ii.   Interest in Regulating the Conduct at Issue

The default rule for conduct-regulating tort rules is *lex loci delicti*—to apply the law of the place of the tort. The logic of the rule is straightforward: generally, "that jurisdiction has the greatest interest in regulating behavior within its borders." *Padula*, 84 N.Y.2d at 522 (citation omitted). New York courts have determined that when the "conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz*, 65 N.Y.2d at 195. Thus, as plaintiffs contend, the law of the jurisdiction in which a plaintiff suffers loss from fraud would usually apply. *See, e.g.*, *Sack v. V.T. Low*, 478 F.2d 360, 365 (2d Cir. 1973).

"However, where the loss was suffered is not conclusive and does not trump a full interest analysis." *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 284 (S.D.N.Y. 2009). "Interest analysis is a 'flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'" *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 337 (2d Cir. 2005) (quoting *Cooney*, 81 N.Y.2d at 72). As a result, courts do not mechanically combine *lex loci delicti* and the "last event necessary" test when the "last event" at issue is not the conduct that the rule regulates.

Courts considering claims of fraud and negligent misrepresentation have instead focused on the place where the fraud was centered and where misrepresentations were made. *See In re Refco Inc. Sec. Litig.*, 892 F. Supp. 2d 534, 538 (S.D.N.Y. 2012) (focusing on "conduct carried out in New York" that gave rise to claims, not on location of "far-flung" investors' losses or domicile of primary fraudulent actor; *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010) (focusing on "overwhelming center of the events giving rise to the case," not place of loss); *Thomas H. Lee*, 612 F. Supp. 2d at 284 (choosing jurisdiction where "bulk of events surrounding the alleged negligent misrepresentation and the underlying fraud" occurred); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (where "injury has occurred in locations with only limited connection to the conduct at issue," governing law is that of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed").

Moreover, in *Sack* and the other cases on which plaintiffs rely, courts rigidly followed the location of the loss to determine the statute of limitations pursuant to New York's borrowing statute, not to determine governing law pursuant to a comprehensive interest analysis. *See Sack*, 478 F.2d at 365. The borrowing statute explicitly adopts the law of the state "where the cause of action *accrued*," which is the place of the last event. *See* N.Y. C.P.L.R. § 202 (emphasis added); *Sack*, 478 F.2d at 365.

In New York's flexible interest analysis, by contrast, courts look to all the "facts or contacts . . . which relate to the purpose of the particular law

in conflict." *Schultz*, 65 N.Y.2d at 197 (citation omitted). Here, common law fraud rules seek to deter the intentional deception of stockholders. New York, where Citigroup is based and where the individual defendants worked, is the site of defendants' allegedly deceptive acts. New York usually applies *lex loci delicti* because of "the locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future." *Schultz*, 65 N.Y.2d at 198. Here, those goals are best served by applying the law of the site of the misrepresentations than by applying the law of the site of the loss. *See Amusement Indus.*, 693 F. Supp. 2d at 341. All parties could reasonably expect New York law to govern the conduct within its borders that forms the basis of both claims. And New York has the greater interest in regulating its vast securities industry to ensure that application of the law leads to the appropriate admonitory effects on industry participants. *See In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d at 226 (collecting cases).

If statements that defendants disseminated to the investing public were subject to the fraud laws of any jurisdiction in which a Citigroup investor lived at the time the statements were made, defendants would be subject to liability pursuant to the laws of all fifty states and an unknown number of foreign nations. That approach would paralyze actors in the securities markets, not regulate their conduct. Even here—despite plaintiffs' attempts to disregard the trust and corporate forms that non-party Arthur Williams chose for his investments by treating Williams himself as the sole plaintiff—at least one of the actual plaintiffs is a Nevada resident, not a Florida resident. (*See* Compl. ¶ 28 ("Plaintiff MFS Inc. [] is a corporation incorporated under the laws of Nevada, with a principal place of business in Nevada.").) Because most defendants are New York residents (*see* Compl. ¶¶ 17-25) and most plaintiffs are Florida residents (*see* Compl. ¶¶ 14-16), the parties' domiciles do not favor either jurisdiction.

Furthermore, plaintiffs allege they were injured only when they sold the stock at a loss. If so, holders of a stock that has fallen in value could establish residence in a state with holder-friendly laws before selling. That change in residence, according to plaintiffs' view, would ensure that the stockholder's chosen state's law applied to his fraud claims in state and

federal courts in New York, regardless of which state (or foreign nation) he had chosen as his new residence. Fortunately, the flexibility of New York's interest analysis prevents the forum shopping that plaintiffs' rigidly formalist reasoning would permit.

Wherever the loss was felt, New York is the jurisdiction with the greatest interest in litigation over claims regarding conduct based in New York. Accordingly, New York law governs these claims.

**C. New York Law Requires Dismissal of the Action.**

> **1. Plaintiffs' Negligent Misrepresentation Claim Fails because They Have Not Alleged a "Special Relationship."**

New York law requires "the existence of a special or privity-like relationship" between the plaintiff and defendant for a successful negligent misrepresentation claim. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011). "[T]he bond between them [must be] so close as to be the functional equivalent of contractual privity." *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 419 (1989). It "requires a closer degree of trust between the parties than that of the ordinary buyer and seller." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003).

Here, because Citigroup is an issuer of shares to public investors, defendants are not in a special privity-like relationship with the investing public, or with actual purchasers (Compl. ¶ 256). *See Int'l Fund Mgmt. S.A.*, 822 F. Supp 2d at 388; *Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011); *cf. Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674-75 (S.D.N.Y. 2009) (finding no special relationship pursuant to New York law because plaintiff and defendant "were merely a buyer and seller of corporate stock"). Moreover, plaintiffs do not even dispute defendants' contention that the Complaint does not meet New York's requirement—relying instead on the argument that Florida law governs. Accordingly, plaintiffs' negligent misrepresentation claim is dismissed.

### 2. *Plaintiffs' Common Law Fraud Claim Fails because They Have Not Alleged Cognizable Damages Proximately Caused by the Fraud.*

New York law, as applied to plaintiffs' allegations, also requires dismissal of the fraud claims. As in *Starr*, the premise of plaintiffs' injuries is the "undeterminable and speculative" proceeds of an alternative bargain reached in "hypothetical market conditions." *See Starr*, 76 A.D.3d at 28. Likewise, New York law mandates that this Court find that the misstatements alleged here are not, as a matter of law, the proximate causes of the "paper 'loss'" that plaintiffs realized when they eventually sold their Citigroup stock in March 2009. *See id.* at 29.

Plaintiffs contend that the Court should distinguish *Starr* for three reasons. First, the *Starr* plaintiff had never sold its AIG shares; plaintiffs, by contrast, sold the Citigroup shares at issue here for $3.09. (Compl. ¶¶ 9, 172-73.) Second, the *Starr* plaintiff also did not realize a trading loss because AIG stock was still trading at a higher price than his acquisition price; here, Arthur Williams acquired these shares for roughly $32 more per share than the price at which plaintiffs sold them. (*Id.* ¶¶ 3, 173.) And third, the *Starr* plaintiff had not alleged precisely the time and terms of the sale it would have made absent the misstatements; plaintiffs, however, have alleged that in "May 2007" they would have sold "16.6 million shares" (*Id.* ¶¶ 48) at the "fraud-free price" of "$51.59" (*Id.* ¶ 171)—their estimate of what the price would have been on May 17, 2007 if defendants had not misled investors. Thus, plaintiffs have indeed pled facts different from those in *Starr*, but these distinctions do not yield a different outcome.

As to the first and second points, even assuming that Williams's 1998 acquisition price is imputed to plaintiffs,[8] *Starr* characterized such losses as

---

[8]    The Court need not address defendants' contention that plaintiffs have not pled any price at which they, as opposed to Arthur Williams, acquired the shares at issue. That contention, which relies on facts outside the complaint, takes two forms: First, the price *Williams* effectively paid to acquire Citigroup stock as part of the 1998 Citicorp-Travelers Group merger is immaterial because *plaintiffs* did not acquire Citigroup stock then. Second, in any event, Williams himself never actually paid $35 for his shares because the nature of the reverse-triangular merger between Citicorp

(*footnote continued on next page*)

mere "paper 'loss[es]'" that are not actually losses for purposes of New York common law fraud injuries. 76 A.D.3d at 29. While "holding [their] stock, [plaintiffs] did not lose . . . any value," even if the market price dropped. *Id.* at 28. In other words, plaintiffs' arguable paper loss might overcome the most literal element of New York's prohibition on the recovery of profits for a portion of the injuries alleged. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 422 (1996). But that paper loss does not survive closer examination of the economic realities pursuant to *Starr*.[9]

As to the third point, plaintiffs misunderstand the *Starr* court's concerns about the speculation required to assess holder claims; *Starr* relied on obstacles to proving the specifics of a claim in court, not obstacles to alleging the specifics in a complaint. 76 A.D.3d at 29. In the passage on which plaintiffs rely, the court explains that holder claims are inherently speculative in part because "the *factfinder* must determine"—while

-----

and Travelers was such that Williams never exchanged his Travelers shares for Citigroup shares; Williams simply retained his share in Travelers, which was then renamed Citigroup. Whatever the force of these contentions, *Starr* compels the dismissal of plaintiffs' claims. The possibility that the technicalities of the 1998 Travelers-Citicorp merger might defeat a common law fraud claim regarding misstatements beginning in 2007 only confirms the Court's view that the New York Court of Appeals would agree with the *Starr* court that these purported out-of-pocket damages are not cognizable pursuant to New York law.

[9] The Court recognizes that *Starr* extends the reasoning of *Lama*. In *Lama*, the "undeterminable and speculative" contractual bargain at issue was an alternative to one that the plaintiff actually accepted in alleged reliance on a fraud. *Lama*, 88 N.Y.2d at 422. In *Starr*, there was no transaction to which the rejected speculative bargain was an alternative. Further, the damages sought in *Lama* constituted the taxes it had paid on the sale due to a new tax law but would not have paid under the alternative arrangement rather than the lost opportunity for a higher price; the court thus considered the new tax rule, not the misrepresentations, the cause of those alleged damages. *Lama*, 88 N.Y.2d at 422-23. But consistent with *Starr*'s reasoning, New York courts have applied *Starr* to bar holder claims even if the plaintiff alleged a paper loss that complies with *Lama*'s narrower pecuniary loss rule. *See Irvin v. Jones*, 966 N.Y.S.2d 346 (Sup. Ct. Suffolk Cnty. 2012) ("[T]o the extent that [a] cause of action may be read as asserting 'holder' claims, *i.e.*, that the plaintiffs[] were wrongfully induced by the defendants to hold rather than sell [certain] investments, such claims are not actionable under New York law.").

imagining a world without the misstatements—whether and when the plaintiff would have sold what number of shares at which price. *Id.* (emphasis added). That plaintiffs allege those details hardly reduces the speculation required for the factfinder to credit the allegations. Plaintiffs can hypothesize about what they would have done, but *Starr* prohibits the courts from doing so.[10]

Indeed, even accepting the allegations that *Starr* deems impermissibly speculative, the Complaint itself belies plaintiffs' assertion that no speculation is required here. Plaintiffs allege that "Williams decided to liquidate his entire 17.6 million share position" in mid-May 2007 and began with "the sale on May 17, 2007 of one million shares" for $55 per share. (*Id.* ¶ 170.) "*Thereafter*, he canceled the remainder of the planned sale in reliance on" the alleged misstatements. (*Id.* (emphasis added).) Plaintiffs do not allege how long "thereafter" Williams cancelled the remaining sales, nor when he had planned to execute the sales before the alleged misstatements caused him to "reverse course." (*Id.*) Plaintiffs also claim as damages the difference between the price they estimate would have prevailed on May 17, 2007 and the price they received in March 2009. (*Id.* ¶ 171-72.) And yet, by plaintiffs' own telling, they would have sold the 16.6 million shares at issue here at some point after May 17, 2007.

New York law bars claims that require a factfinder to cut through this many "layers of uncertainty" and speculation. *Starr*, 76 A.D.3d at 30. Therefore, the Court dismisses plaintiffs' common law fraud claims for failure to allege cognizable non-speculative damages that the misstatements proximately caused.

## III. CONCLUSION

Having found that New York has a greater interest than Florida in regulating the conduct at issue here, the Court applies New York law.

---

[10]   Plaintiffs contend that they are not speculating about the price they would have received because they rely on an expert who used an event study to determine the effect of the misstatements on the market. But this response is inapposite because the proffered event study addresses at most only one of the several layers of speculation that the *Starr* court bemoaned. *See* 76 A.D.3d at 29-30.

Concluding that the reasoning of the Appellate Division, First Department, in *Starr Foundation v. American International Group, Inc.*, 76 A.D.3d 25 (1st Dep't 2010), is the best predictor of how the New York Court of Appeals would decide the holder claims at issue here, the Court applies *Starr* to plaintiffs' claims. *Starr*, in turn, requires that the Court dismiss plaintiffs' fraud claims. Plaintiffs' negligent misrepresentation claims must also be dismissed because plaintiffs have not alleged that they had a special privity-like relationship with defendants. Accordingly, defendants' motion to dismiss the Amended Complaint is granted with prejudice.

Dated: New York, New York
      October 30, 2013

SO ORDERED:

Sidney H. Stein, U.S.D.J.

22